UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE NEW YORK TIMES COMPANY,<br><br>    Plaintiff,<br><br>    – against –<br><br>DEPARTMENT OF HEALTH &<br>HUMAN SERVICES,<br><br>    Defendant. | Case No.: 20-cv-3063 |
| DOW JONES & COMPANY, INC. and<br>CHRISTOPHER WEAVER,<br><br>    Plaintiffs,<br><br>    – against –<br><br>DEPARTMENT OF HEALTH &<br>HUMAN SERVICES,<br><br>    Defendant. | Case No.: 20-cv-3145 (consolidated) |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

David E. McCraw
Al-Amyn Sumar
Alexandra Perloff-Giles
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: 212-556-4031
Fax: 212-556-4634
Email: mccrad@nytimes.com
          al-amyn.sumar@nytimes.com
          aperloffgiles@nytimes.com

*Counsel for Plaintiff The New York Times Company*

Seth D. Berlin
Matthew E. Kelley (admitted *pro hac vice*)
Ballard Spahr LLP
1909 K Street, NW
12th Floor
Washington, DC 20006-1157
Phone: 202-508-1122
Fax: 202-661-2299
Email: berlins@ballardspahr.com
          kelleym@ballardspahr.com

*Counsel for Plaintiffs Dow Jones & Company, Inc. and Christopher Weaver*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 3

A.    The Indian Health Service ................................................................................ 3

B.    Weber's Decades-Long Pattern of Sexual Crimes at IHS ............................... 6

C.    The Public Controversy and the Response by IHS and Other Federal
Agencies ........................................................................................................... 9

       1.    IHS Announces A New Policy ............................................................. 9

       2.    Government Investigations ................................................................. 11

D.    IHS Also Commissions Integritas to Conduct a Review ............................... 13

E.    *The New York Times* and *The Wall Street Journal* Request the Report Under
FOIA ............................................................................................................... 18

F.    The News Organizations' Lawsuits, and IHS's Belated Denial of the FOIA
Requests ......................................................................................................... 19

ARGUMENT ................................................................................................................. 21

A.    The Government Has Not Satisfied Its Burden of Justifying Withholding
Under Exemption 3 ........................................................................................ 22

       1.    Section 1675 Is Limited to Records Reflecting Peer Review by
Medical Professionals ...................................................................... 22

       2.    The Integritas Report Is Not a Medical Quality Assurance Record ...... 27

B.    The Government Has Not Met Its Burden of Justifying Withholding Under
Exemption 5 ................................................................................................... 31

C.    At a Minimum, In Camera Review Is Warranted ......................................... 37

CONCLUSION .............................................................................................................. 39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A. Michael's Piano, Inc. v. FTC*,
  18 F.3d 138 (2d Cir. 1994)..........................................................................................22

*ACLU v. DOD*,
  40 F. Supp. 3d 377 (S.D.N.Y. 2014)...........................................................................23

*Adelante Alabama Worker Center v. U.S. Department of Homeland Security*,
  376 F. Supp. 3d 345 (S.D.N.Y. 2019).........................................................................33

*Army Times Publishing Co. v. Department of Air Force*,
  998 F.2d 1067 (D.C. Cir. 1993) ..................................................................................37

*Assadi v. U.S. Citizenship & Immigration Services*,
  2015 U.S. Dist. LEXIS 42544 (S.D.N.Y. Mar. 31, 2015) ...................................21, 37

*Associated Press v. Department of Defense*,
  554 F.3d 274 (2d Cir. 2009)........................................................................................21

*Associated Press v. U.S. Department of Defense*,
  2006 U.S. Dist. LEXIS 67913 (S.D.N.Y. Sep. 20, 2006).............................................22

*Babcock v. Bridgeport Hospital*,
  251 Conn. 790 (1999) ..................................................................................................27

*Bloomberg, L.P. v. Board of Governors of Federal Reserve*,
  601 F.3d 143 (2d Cir. 2010).........................................................................................21

*Brennan Center for Justice v. Department of Justice*,
  697 F.3d 184 (2d Cir. 2012).............................................................................32, 33, 36

*CIA v. Sims*,
  471 U.S. 159 (1985).....................................................................................................23

*Coastal States Gas Corp. v. Department of Energy*,
  617 F.2d 854 (D.C. Cir. 1980).....................................................................................32

*Department of the Air Force v. Rose*,
  425 U.S. 352 (1976).....................................................................................................21

*Department of Interior v. Klamath Water Users Protective Association*,
  532 U.S. 1 (2001)..............................................................................................21, 31, 36

*Environmental Protection Agency v. Mink,*
    410 U.S. 73 (1973)................................................................................32

*Fox News Network, LLC v. U.S. Department of the Treasury,*
    739 F. Supp. 2d 515, 539 (S.D.N.Y. 2010)................................................35

*Grand Central Partnership, Inc. v. Cuomo,*
    166 F.3d 473 (2d Cir. 1999).........................................................32, 33

*Grandstaff v. State,*
    171 P.3d 1176 (Alaska Ct. App. 2007).......................................................29

*Hall v. CIA,*
    881 F. Supp. 2d 38 (D.D.C. 2012)............................................................38

*Halpern v. F.B.I.,*
    181 F.3d 279 (2d Cir. 1999).................................................................38

*Intellectual Property Watch v. U.S. Trade Representative,*
    134 F. Supp. 3d 726 (S.D.N.Y. 2015)......................................................36

*Intellectual Property Watch v. U.S. Trade Representative,*
    205 F. Supp. 3d 334 (S.D.N.Y. 2016)......................................................23

*Johnson v. Executive Office for United States Attorneys,*
    310 F.3d 771 (D.C. Cir. 2002).............................................................37

*Keats v. United States,*
    2013 U.S. Dist. LEXIS 172176 (D.S.D. Dec. 6, 2013) ...............................7

*Kulik v. United States,*
    2016 U.S. Dist. LEXIS 84802 (D. Alaska June 28, 2016) .........................25

*Lead Industries Association v. OSHA,*
    610 F.2d 70 (2d Cir. 1979)................................................................35

*Lucaj v. FBI,*
    852 F.3d 541 (6th Cir. 2017) ...........................................................35

*National Security Archive v. CIA,*
    752 F.3d 460 (D.C. Cir. 2014)...........................................................33

*Navasky v. CIA,*
    499 F. Supp. 269 (S.D.N.Y. 1980) .....................................................22

*Neuman v. United States,*
    70 F. Supp. 3d 416 (D.D.C. 2014)......................................................38

*New York Times Co. v. U.S. Department of Defense*,
499 F. Supp. 2d 501 (S.D.N.Y. 2007).....................................................................33

*NLRB v. Robbins Tire & Rubber Co.*,
437 U.S. 214 (1978)..............................................................................................21

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975)..............................................................................................31

*NRDC v. United States EPA*,
2019 U.S. Dist. LEXIS 124353 (S.D.N.Y. July 25, 2019) ....................................34

*Parker v. United States*,
2020 U.S. Dist. LEXIS 24911 (D. Neb. Feb. 13, 2020) .......................................24, 25, 30, 31

*Pope v. United States*,
2018 U.S. Dist. LEXIS 173716 (W.D. Wash. Oct. 9, 2018) .................................26

*Rojas v. FAA*,
927 F.3d 1046 (9th Cir. 2019) ..............................................................................35

*Salazar v. United States*,
2018 U.S. Dist. LEXIS 96128 (S.D.N.Y. June 7, 2018).......................................26, 38

*Shinnecock Indian Nation v. Kempthorne*,
652 F. Supp. 2d 345 (E.D.N.Y. 2009) ...................................................................38

*Soto v. United States*,
2014 U.S. Dist. LEXIS 133134 (S.D. Cal. Sept. 22, 2014)...................................23, 24, 30, 38

*Tigue v. U.S. Department of Justice*,
312 F.3d 70 (2d Cir. 2002)....................................................................................35

*Welby, Brady & Greenblatt, LLP v. U.S. Department of Health & Human Services*,
2016 U.S. Dist. LEXIS 56605 (S.D.N.Y. Apr. 27, 2016).....................................35, 36

*Yocabet v. UPMC Presbyterian*,
119 A.3d 1012 (Pa. Super. 2015)..........................................................................27

**Statutes**

5 U.S.C. § 552............................................................................................... *passim*

10 U.S.C. § 1102.....................................................................................................26

25 U.S.C. § 1603.....................................................................................................28

25 U.S.C. § 1675........................................................................................... *passim*

38 U.S.C. § 5705 ........................................................................................................26

**Other Authorities**

114 Cong. Rec. S1496 (2016) ....................................................................................34

162 Cong. Rec. H3717 (2016) ...................................................................................34

83 Fed. Reg. 66284 (Dec. 26, 2018) ..........................................................................13

S. Rep. 99-331 (1986) ................................................................................................26

S. Rep. 114-4 (2015) ..................................................................................................34

Staff Report, U.S. House of Rep., Comm. On Oversight and Gov't Reform, *FOIA Is Broken: A Report* (Jan. 2016) ..............................................................................34

## INTRODUCTION

For more than two decades, Stanley Patrick Weber used his privileged post as an Indian Health Service pediatrician to prey on children in Native communities. He invited boys into his government housing and showered them with money, travel, pizza, ice cream, candy, alcohol, video games, and attention – then raped them over, and over, and over again.

And the Indian Health Service let him do it.

Co-workers who raised alarms about Weber's behavior were ignored, belittled, and even punished. When the signs of Weber's abuse became too prominent to ignore at the hospital serving the Blackfeet Nation in Montana, IHS officials did not fire Weber, refer the matter to the FBI, or even notify any licensing authorities. Instead, IHS transferred Weber to its hospital serving the Oglala Lakota Nation in South Dakota, where he continued abusing further generations of American Indian children. There, several misconduct investigations petered out without consequences for Weber or the IHS officials who looked the other way.

Weber was stopped only when Oglala Lakota tribal prosecutors began investigating and ultimately were joined by authorities from the Bureau of Indian Affairs and the Department of Health and Human Services' Office of Inspector General ("OIG"). That investigation ended with Weber's convictions in federal courts in Montana and South Dakota in 2018 and 2019, respectively. Now, Weber is finally in prison where he belongs, serving more than five life terms for sexually abusing children in the Blackfeet and Oglala Lakota communities.

As the criminal cases against Weber unfolded, journalists from *The Wall Street Journal* and PBS's *Frontline* documentary series began a joint investigation. The resulting *WSJ* coverage and hour-long television documentary, both published in early February 2019, detailed the

systemic failings by IHS that allowed this sexual predator to operate unchecked for decades.[1] A *New York Times* investigation published in October 2019 examined additional problems at IHS through the lens of the increasing efforts by tribes to take over troubled facilities such as the Sioux San hospital in Rapid City, South Dakota.[2]

Eighteen months ago, IHS issued a solicitation for a contractor to investigate IHS's failures. IHS awarded that contract to a small business named Integritas Creative Solutions, LLC in May 2019, and the contractor issued its report to IHS (the "Integritas Report") in January 2020. Although IHS officials had promised transparency to Congress and tribal officials, IHS refused to provide the Integritas Report to lawmakers or the public. Through this consolidated action, The Times and The Journal are seeking to vindicate the public's right to information about this government agency's horrific shortcomings by requiring IHS to release the Integritas Report pursuant to the Freedom of Information Act.

As Plaintiffs demonstrate below, IHS's justifications for withholding the Integritas Report are without merit. Despite the agency's attempts to invoke Exemption 3, and to hide the report under the cover of a "medical quality review," the Integritas Report is not about the quality of medical care because Weber's sexual assaults were crimes, not medical care. IHS also cannot withhold the report pursuant to the deliberative process privilege under Exemption 5

---

[1] Christopher Weaver, Dan Frosch & Gabe Johnson, *A Pedophile Doctor Drew Suspicions for 21 Years. No One Stopped Him*, WALL ST. J. (Feb. 8, 2019), https://www.wsj.com/articles/a-pedophile-doctor-drew-suspicions-for-21-years-no-one-stopped-him-11549639961, attached hereto as Exhibit 1 to the Declaration of Matthew E. Kelley (hereinafter, "Ex. __"); *Predator on the Reservation*, FRONTLINE (Feb. 12, 2019), https://www.pbs.org/wgbh/frontline/film/predator-on-the-reservation/ (Ex. 2). Following the Government's lead and consistent with the practice in this Court, Plaintiffs are not filing a Rule 56.1 statement. However, Plaintiffs would be pleased to provide one if it would be useful to the Court.

[2] Mark Walker, *Fed Up With Deaths, Native Americans Want to Run Their Own Health Care*, N.Y. TIMES (Oct. 19, 2019), https://www.nytimes.com/2019/10/15/us/politics/native-americans-health-care.html?smid=em-share (Ex. 3).

because (a) the agency had already announced its revised policy to better police sexual misconduct months before Integritas began its work, (b) the Report was authored by a third party risk assessment firm, with no role in the formulation of IHS policy, and (c) in any event the extensive factual portions of the report cannot be withheld under that privilege, particularly given the Government's own prior widespread dissemination of those facts. Moreover, under amendments to FOIA, IHS is required to make an additional showing of foreseeable harm before relying on Exemption 5, but it has not addressed those amendments nor has it even *attempted* to make the required showing.

FOIA mandates that the Integritas Report be disclosed.

## FACTUAL BACKGROUND

The following factual narrative, substantial portions of which were omitted from the Government's statement of facts, is drawn from public reports issued by government entities including the HHS OIG, a Presidential Task Force, and Congressional committees, as well as from the federal prosecutions of Weber and prior news reports documenting IHS's failure to police criminal conduct by its employees.

### A.    The Indian Health Service

The Indian Health Service provides medical care to more than 2.6 million American Indians and Alaska Natives to fulfill the federal government's statutory and treaty obligations to members and descendants of the 574 federally recognized tribes.[3] With an annual budget of $6 billion, it directly operates 24 hospitals and more than 75 clinics, and funds an additional 22 hospitals and more than 400 clinics operated by tribes and Alaska Native corporations.[4] As

---

[3] *See IHS Profile*, INDIAN HEALTH SVC., https://www.ihs.gov/newsroom/factsheets/ihsprofile/ (Ex. 4).

[4] *Id.*

reflected below, this mission involves both the provision of medical care and, as is pertinent

here, the administration of its operations, including the proper supervision of its employees.

Like other federal agencies serving American Indians,[5] IHS has suffered from chronic

underfunding, mismanagement, low morale and high employee turnover, as a Presidential Task

Force Report released earlier this year explained.[6] And as a 2019 Report by the HHS OIG

detailed, although only a fraction of IHS employees are incompetent or malevolent, the agency's

many skilled and dedicated professionals are often overworked because more than one in five

IHS jobs are vacant.[7] An analysis of government data by *The New York Times* found that a

quarter of IHS's medical provider jobs are vacant – a rate that approaches 50 percent in some

areas.[8]

Over the past several decades, journalists and government investigators have repeatedly

exposed IHS's problems not only with inadequate medical care, but also with mismanagement

and inept or predatory staff, but those deficiencies have continued. In 2002, for example, the

Associated Press reported that at least 21 IHS doctors had been sanctioned by medical licensing

---

[5] *See, e.g.*, U.S. COMM'N ON CIVIL RIGHTS, BROKEN PROMISES: CONTINUING FEDERAL FUNDING SHORTFALL FOR NATIVE AMERICANS 1-4 (2018), https://www.usccr.gov/pubs/2018/12-20-Broken-Promises.pdf (Ex. 5); GOV'T ACCOUNTABILITY OFFICE, GAO-19-157SP, SUBSTANTIAL EFFORTS NEEDED TO ACHIEVE GREATER PROGRESS ON HIGH-RISK AREAS 128-31 (2019), https://www.gao.gov/assets/700/697245.pdf (identifying American Indian programs including IHS as vulnerable to waste, fraud, abuse and mismanagement) (Ex. 6).

[6] PRESIDENTIAL TASK FORCE ON PROTECTING NATIVE AM. CHILDREN IN THE INDIAN HEALTH SVC. SYS., REPORT 1, 12 (2020) ("Task Force Report"), https://www.justice.gov/usao-ndok/press-release/file/1297716/download (Ex. 7).

[7] U.S. DEP'T OF HEALTH AND HUMAN SERVS. OFFICE OF INSPECTOR GEN., OEI-16-19-00330, INDIAN HEALTH SERVICE HAS STRENGTHENED PATIENT PROTECTION POLICIES BUT MUST FULLY INTEGRATE THEM INTO PRACTICE AND ORGANIZATIONAL CULTURE 14 (2019) ("OIG Report"), https://oig.hhs.gov/oei/reports/oei-06-19-00330.pdf (Ex. 8).

[8] *See* Ex. 3.

authorities, including a gynecologist who worked at the Phoenix Indian Medical Center for eight years despite telling the agency before he was hired that he had served prison time for trying to molest four girls.[9] That doctor's explanation was the verbal equivalent of a shrug: "I guess they needed a doctor eight years ago."[10]

In 2010, an investigation by the then-chairman of the Senate Indian Affairs Committee found numerous problems with mismanagement and lack of accountability at the IHS regional office serving 18 tribes in the Dakotas, Nebraska and Iowa. Among other things, that investigation found that, "[o]ver the course of the last ten years, IHS repeatedly used transfers, reassignments, details, or lengthy administrative leave to deal with employees who had a record of misconduct or poor performance."[11]

That's precisely what happened with Stanley Patrick Weber, whose work in South Dakota was overseen by that same regional office. As the HHS OIG later concluded, Weber's "case was particularly troubling given that hospital staff raised suspicions, on multiple occasions, that Dr. Weber was abusing children, yet he continued to work as a pediatrician at IHS hospitals until his resignation, which allowed him to treat and victimize children for more than two decades." OIG Report at 2.

---

[9] Matt Kelley, *Lax Physician Oversight Threatens Care for American Indians*, THE ASSOCIATED PRESS (Mar. 10, 2002), *available at* https://www.latimes.com/archives/la-xpm-2002-mar-10-mn-32077-story.html (Ex. 9). The AP reported that another doctor practicing at the Alaska Native Medical Center in Anchorage had surrendered her Colorado medical license after having sexual relationships with two patients, one of whom was only 19 years old at the time. *Id.* In the interest of full disclosure, Plaintiffs note one of the undersigned counsel for Plaintiffs Dow Jones and Weaver, who previously was an AP journalist, authored this article.

[10] *Id.*

[11] U.S. SENATE COMM. ON INDIAN AFFAIRS, IN CRITICAL CONDITION: THE URGENT NEED TO REFORM THE INDIAN HEALTH SERVICE'S ABERDEEN AREA 5 (2010), https://www.indian.senate.gov/sites/default/files/upload/files/Chairman-s-Report-In-Critical-Condition-12-28-10.pdf?mod=article_inline (Ex. 10).

B.  **Weber's Decades-Long Pattern of Sexual Crimes at IHS**

As the current IHS director explained at a 2019 Senate Indian Affairs Committee hearing, the Indian Health Service assigned Weber to the Blackfeet Community Hospital in 1992.[12] Community members and fellow staffers repeatedly raised concerns about Weber's inappropriate contacts with young boys, such as hanging out with them at a pizza restaurant or arranging a camping trip with them. Ex. 1 at 6. After hospital administrators learned Weber had at least one boy stay overnight at his house and had been assaulted by an angry parent, they determined he had to leave. *Id.* Mary Ellen LaFromboise, the IHS hospital's CEO at the time, told the *WSJ* that she advised regional IHS officials about her staff's concerns that Weber was a pedophile, but that she was unaware of any IHS doctor ever being fired, even for misconduct. *Id.*

Instead, IHS transferred Weber to the Pine Ridge Hospital serving the Oglala Lakota Nation in South Dakota in June 1995. SIAC Hearing at 65. Almost immediately, he started abusing more boys; within a few months, Weber was suspended after a parent complained, as Sarah Dye, who was then an official in IHS's Great Plains regional office, told the *WSJ*. Ex. 1 at 6.[13] But Weber was reinstated after that investigation closed without any criminal charges being filed, Dye explained. *Id.*

In 2009, Dr. Mark Butterbrodt, a fellow pediatrician at the Pine Ridge facility, complained about Weber to his supervisors, who suspended Weber and convened a panel to

---

[12] *Where Are They Now: Indian Programs on the GAO High Risk List: Hearing Before the S. Comm. on Indian Affairs*, 116th Cong. 42 (2019) (testimony of Rear Adm. Michael Weahkee, Principal Deputy Dir., Indian Health Serv.) ("SIAC Hearing"), https://www.indian.senate.gov/sites/default/files/documents/CHRG-116shrg38001.pdf (Ex. 11).

[13] At Weber's South Dakota sentencing hearing, Judge Jeffrey Viken stated that according to the presentence report, shortly after Weber arrived at Pine Ridge, "there was already a complaint about sexual abuse of a minor made during a school exam at IHS." Tr. of Sentencing Hrg. at 44:11-14, *United States v. Weber*, No. 17-50033-01 (D.S.D. Feb. 10, 2020) ("Sentencing Tr.") (Ex. 12).

investigate. *Id.* at 8; *see also* Declaration of Mark P. Butterbrodt, M.D. ("Butterbrodt Decl.")
¶¶ 7-8. The matter was referred to Ronald Keats, an official in the IHS regional office, but he
later pleaded guilty to possession of child pornography kept on his government computer. Ex. 1
at 8-9; *see also Keats v. United States*, 2013 U.S. Dist. LEXIS 172176, at *5-6 (D.S.D. Dec. 6,
2013) (denying motion to vacate sentence and noting the court found at sentencing Keats "had
over 6,000 images of child pornography on his government-issued laptop, his external hard drive
and compact discs"). The Pine Ridge Hospital's former clinical director, Jan Colton, had also
appointed a panel to investigate at the local level, but it failed to find evidence of misconduct.
Ex. 1 at 8; Butterbrodt Decl. ¶ 8.

Weber returned to work. *Id.* Dr. Butterbrodt did not fare as well. After his complaint
failed to result in any consequence to Weber, Dr. Butterbrodt was transferred to a facility in
North Dakota and stripped of his bonus pay; he eventually retired from IHS. Ex. 1 at 9. Later,
Dr. Butterbrodt made an anonymous complaint to Pine Ridge Hospital CEO Wehnona Stabler,
who took no action but who was later convicted of failing to report on her 2013 financial
disclosure form that she had received a $5,000 payment from Weber.[14]

Finally, in 2015 an Oglala Lakota tribal prosecutor began investigating Weber and
located one of his victims. Ex. 1 at 10-11. After the case was referred to the BIA and OIG,
someone at IHS tipped off Weber that he was under investigation. *Id.* at 11. He resigned the next
day. *Id.*

Weber eventually was charged with sexual abuse and related crimes in federal courts in
Montana, for abusing Blackfeet boys, and in South Dakota, for abusing Oglala Lakota boys.

---

[14] Press Release, U.S. Attorney's Office for the District of South Dakota, Nebraska Woman
Sentenced for Making a False Statement (July 3, 2018), https://www.justice.gov/usao-
sd/pr/nebraska-woman-sentenced-making-false-statement (Ex. 13).

Ex. 1 at 3.[15] Federal prosecutors called 10 witnesses at Weber's trial in Great Falls, Montana;

victims testified they were as young as 10 or 11 years old when he started abusing them.[16] The

jury convicted Weber on four counts of sexual abuse in September 2018, and he was sentenced

to 18 years in prison.[17]

After a second criminal trial in September 2019 in Rapid City, South Dakota, a federal

jury convicted Weber on eight counts of sexual abuse.[18] At Weber's sentencing, one man who

was about 9 or 10 years old when Weber began abusing him told the Court: "I need help. I'm

trying to get help, but I refuse to go to IHS."[19] The man's mother also spoke at the sentencing,

telling the Court: "For a long time, and even now, I look at my son and I failed him because I – I

trusted [Weber] with my son. I trusted him because IHS trusted him. They hired him."[20]

U.S. District Judge Jeffrey Viken sentenced Weber to five consecutive life prison terms

and an $800,000 fine.[21] Judge Viken admonished Weber:

---

[15] *See also* Press Release, U.S. Attorney's Office for the District of South Dakota, Spearfish Man Indicted for Multiple Sex Offenses (Mar. 2, 2017), https://www.justice.gov/usao-sd/pr/spearfish-man-indicted-multiple-sex-offenses (Ex. 14).

[16] Sentencing Mem. at 6, *United States v. Weber*, No. 4:18-cr-00014-BMM (D. Mont. Dec. 7, 2018) (Ex. 15).

[17] *See* Judgment, *United States v. Weber*, No. 4:18-cr-00014-BMM (D. Mont. Jan 18, 2019) (Ex. 16).

[18] *See generally* Sentencing Tr. (Ex. 12).

[19] *Id.* at 38:5-9.

[20] *Id.* at 39:25-40:2.

[21] *Id.* at 68:5 – 69:9, 71:14-17.  *See also* Press Release, U.S. Attorney's Office for the District of South Dakota, Convicted Former Pine Ridge Indian Health Service Pediatrician Sentenced to Five Consecutive Life Sentences for Multiple Sex Offenses Against Children (Feb. 10, 2020), https://www.justice.gov/usao-sd/pr/convicted-former-pine-ridge-indian-health-service-pediatrician-sentenced-five-consecutive (Ex. 17).

[Pine Ridge] is a difficult hospital. It's had its challenges since I first came to this court as a young lawyer in 1977. And I brought many Federal Tort Claim Act cases against Indian Health Services out of Pine Ridge Hospital in my 20 years of private practice. But I have never, in all that experience, [seen] anything that comes close to the abuse of trust that you have inflicted on these boys. They're men now. But you know from your contact with them and those of us who were at trial know these were little boys, not sophisticated, being brought to you by parents, grandmas, or directed that they go see you as part of their school physicals. They were completely vulnerable and totally innocent.[22]

## C.    **The Public Controversy and the Response by IHS and Other Federal Agencies**

The *WSJ* and *Frontline* reports were published in February 2019, in between Weber's two trials. The news organizations' exposure of the chronic IHS failures that enabled Weber's crimes ignited a firestorm of criticism in Washington and throughout Indian Country. Typical of the reaction was a statement by Chickasaw Nation Governor Bill Anoatubby: "It is heartbreaking and unconscionable that an IHS pediatrician was allowed to prey on Indian children."[23]

### 1.    **IHS Announces A New Policy**

As Weber's prosecutions developed, IHS began taking steps to head off anticipated criticism of the underlying systemic problems that allowed him to abuse Indian children and facilitated his continued employment by IHS despite his supervisors' and co-workers' deep concerns. Rear Admiral Michael Weahkee, then the acting head of the IHS,[24] issued a "Dear Tribal Leader" letter in October 2018, after Weber's first conviction, "to express the [agency's] concern about sexual abuse of minors by a former IHS physician, Dr. Stanley Patrick Weber,"

---

[22] Sentencing Tr. (Ex. 12) at 58:20-59:7.

[23] Press Release, U.S. Attorney's Office for the Northern District of Oklahoma, U.S. Attorney Shores Appointed Co-Chair of Presidential Task Force on Protecting Native American Children in the Indian Health Service System (Mar. 26, 2019), https://www.justice.gov/usao-ndok/pr/us-attorney-shores-appointed-co-chair-presidential-task-force-protecting-native (Ex. 18).

[24] The Senate confirmed Rear Admiral Weahkee's appointment as IHS Director on April 21, 2020.  *See* https://www.congress.gov/nomination/116th-congress/1250?s=2&r=1 (Ex. 19).

adding that IHS leaders "have heard from many who are rightfully alarmed and are questioning how IHS is addressing this situation."[25] Rear Admiral Weahkee wrote that IHS was "reminding" all staff about their duty to report suspected abuse and of the protections for whistleblowers; drafting a new policy "to further stress zero tolerance for abuse of children"; and initiating what he described as "an internal patient safety medical quality assurance review."[26]

On February 6, 2019, IHS published an update to its Indian Health Manual containing the new policy, promised by Rear Admiral Weahkee, to combat child sexual abuse by the agency's staff.[27] The new policy included requirements that chaperones be allowed during examinations of children; more explicit rules regarding provider-patient boundaries; and stricter reporting requirements for suspected abuse. OIG Report (Ex. 8) at 8-12. Despite the new policy's promise of greater attention to the issue, the OIG Report noted that the agency "received several reports of patient abuse allegations" after the new policy was announced, but refused to disclose publicly how many, citing the "medical quality review" confidentiality provisions of 25 U.S.C. § 1675. *Id.* at 18.[28]

---

[25] Letter from Indian Health Service Principal Deputy Director Michael Weahkee (Oct. 26, 2018), https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/2018_Letters/DTLL_10262018.pdf (Ex. 20).

[26] *Id.*

[27] *See* Indian Health Service, Transmittal Notice 19-03 (Feb. 6, 2019), https://www.ihs.gov/ihm/tn/2019/transmittal-notice-19-03/ (Ex. 21).

[28] Even assuming that the statute would apply to reports about criminal activity, this assertion by IHS is directly contrary to the explicit language of the statute. *See* 25 U.S.C. § 1675(e)(1) ("Nothing in this section shall be construed as authorizing or requiring the withholding from any person or entity aggregate statistical information regarding the results of any Indian health program or urban Indian organization's medical quality assurance programs.").

### 2.   Government Investigations

The publication of the *WSJ* report (on February 8, 2019) two days after IHS issued its new policy and the airing of the *Frontline* report four days thereafter (on February 12, 2019), *see supra* note 1, increased public scrutiny of IHS, including pressure to ensure that what happened with Weber would not happen again. Those concerns led to several government investigations.

**a.   *The HHS Inspector General Investigation.*** In February 2019, the Deputy Secretary of Health and Human Services asked the HHS OIG "to review IHS's newly implemented series of system-wide policies and procedures designed to promote a zero-tolerance for patient abuse" in the wake of the Weber revelations. OIG Report (Ex. 8) at 3. That report, released in December 2019, found that, although the policies had been strengthened, "gaps in coverage remain and some facilities have yet to update their local policies" to align with the new agency-wide policy. *Id.* at 8. The OIG also found confusion among IHS staff regarding how and to whom suspicions of abuse should be reported and continuing problems with unclear lines of authority, high turnover, and administrative apathy that were hindering progress on combatting criminal conduct by employees. *Id.* at 16-20.

**b.   *The White House Task Force.*** In March 2019, the White House appointed a task force of prosecutors and other officials "to investigate the institutional and systemic breakdown that failed to prevent and stop after detection a predatory pediatrician working at the Indian Health Service (IHS) from sexually assaulting children."[29] Echoing previous analyses of IHS, the Task Force's report, issued in July 2020, found "fundamental and longstanding deficiencies at IHS" including inadequate training, a lack of clarity on the procedures for reporting suspected

---

[29] Task Force Report at 1 (Ex. 7); *see* note 6 *supra*.

child abuse; and "systemic issues of low-morale, lack of leadership, and inability to recruit and retain enough qualified healthcare professionals."[30]

      **c.**    ***Congress and the Government Accountability Office.*** In the aftermath of the *WSJ* and *Frontline* exposés, members of the Congressional committees overseeing IHS operations and spending repeatedly pressed Rear Admiral Weahkee to, in the words of Senator Lisa Murkowski of Alaska, "make sure that we are taking steps to ensure that we never see situations like this again."[31] Senator Catherine Cortez Masto of Nevada, for example, told Weahkee at an Indian Affairs Committee hearing:

> It is outrageous to me that it went on so long, the predatory nature of this doctor, nobody came forward, and it continued over so many years. . . . I am looking forward to further hearing, understanding what happened, and the accountability and how we are going to prevent this from happening in the future.

SIAC Hearing (Ex. 11) at 50. The Chair and Vice-Chair of the Senate Indian Affairs Committee asked HHS OIG to investigate, *id.* at 3, a request the OIG wrapped into the probe requested of it by HHS leadership, *see* OIG Report (Ex. 8) at ii.

      Citing the *WSJ* report, on May 16, 2019 nine members of the Senate Indian Affairs Committee also asked the Government Accountability Office to investigate several issues related to the Weber case.[32] Those issues included whether IHS has adequate procedures in place to document allegations of misconduct against medical providers and the extent to which IHS has

---

[30] Task Force Report at 1 (Ex. 7).

[31] *Hearing on Indian Health Svc. Appropriations for Fiscal Year 2020, S. Appropriations Subcomm. on Dep't of the Interior, Environment, and Related Agencies*, 116th Cong. 2 (2019) (Statement of Chair Sen. Lisa Murkowski), https://www.govinfo.gov/content/pkg/CHRG-116shrg99104864/pdf/CHRG-116shrg99104864.pdf (Ex. 22).

[32] Letter from Sens. Tom Udall, John Hoeven, et al. to Gene Dodaro, Comptroller General of the United States (May 16, 2019), https://www.tomudall.senate.gov/imo/media/doc/LETTER%20GAO%20Request%20IHS%20Employee%20Transfer%20Misuse%20(signed).pdf (Ex. 23).

responded to misconduct allegations by transferring an accused employee or placing him on leave.[33] That review remains ongoing.

### D.   IHS Also Commissions Integritas to Conduct a Review

Two weeks after the *WSJ* had submitted written questions about the Weber case to Rear Admiral Weahkee, IHS began the process of commissioning a third-party review. Ex. 1 at 11. On October 16, 2018, IHS issued a pre-solicitation Request For Information regarding a proposed contract

> to perform an internal patient safety medical quality assurance review of the Indian Health Service's (IHS) policies and procedures regarding the reporting of allegations of sexual abuse of IHS patients by IHS clinical staff. The review will focus on the Oklahoma City, Billings, and Great Plains Areas, and will include a review of whether policies and procedures have been and are being followed with regard to protecting patients from sexual abuse by providers in the health care delivery environment, and to identify any improvements IHS could implement to better protect both patients and staff.[34]

The posting explained further that "IHS is assessing both a retrospective and current state of the agency's compliance with existing laws, regulations, and policies regarding patient safety and protection of patients from sexual abuse and assault."[35]

---

[33] *Id.* at 1-2.

[34] U.S. Indian Health Service, Sources Sought Notice, Solicitation No. 19-236-SOL-00002 (Oct. 16, 2018) (the "RFI") (Ex. 24). Although HHS implies that this effort was undertaken by the IHS Office of Quality, *e.g.*, Merrell Decl. ¶ 7, that office was not actually established until two months later, in December 2018, when IHS announced its formation "in response to challenges in delivering quality health care in Indian Country." News Release, Indian Health Service, Indian Health Service Announces New Office of Quality (Dec. 21, 2018), https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/PressRelease-IndianHealthServiceAnnouncesNewOfficeofQuality_122118.pdf (Ex. 25). The announcement said the reorganization would be effective on January 26, 2019. *Id.*; *see also* Organization, Functions, and Delegations of Authority; Part G: Indian Health Service, 83 Fed. Reg. 66284 (Dec. 26, 2018) (regulation establishing Office of Quality).

[35] *See* RFI at 2.

On February 22, 2019, IHS followed up by issuing Solicitation No. IHS-19-236-SOL-00002 for a "Medical Quality Assurance Review." Decl. of Jonathan Merrell ("Merrell Decl.") ¶ 7 (Dkt. 21); U.S. Indian Health Service, Solicitation No. IHS-19-236-SOL-00002, IHS Internal Medical Quality Assurance Review (Feb. 22, 2019) (the "RFP") (Ex. 26). "We seek a comprehensive analysis showing how IHS could significantly improve the identification of, and response to complaints of patient abuse, especially sexual abuse of minors," the RFP said. *Id.* "The contractor will perform a fact-finding inquiry and record review at the Oklahoma Area IHS, Billings Area IHS and Great Plains Area IHS, and IHS Headquarters in Rockville, MD." *Id.* The RFP recited that the review's objectives were to "(a) identify facts relating to IHS's policies and procedures regarding the reporting of allegations of sexual abuse of IHS patients by clinical staff; (b) identify any possible process or system failures and the contributing causes of any such process or system failures; and (c) make recommendations for improvement." *Id.*

Although the agency described the exercise as a "medical quality review," the RFP did not state that the team conducting the review needed to include any physician or licensed health care provider – or anyone with any medical experience at all. *Id.* Rather, the RFP listed the top criterion for a successful bidder as "a comprehensive understanding of and experience in conducting investigations; reviews of compliance with laws, regulations and policies; identifying weaknesses in day-to-day operations and reporting systems applicable to allegations of impropriety; developing recommendations to effectively remediate weaknesses and to strengthen and improve agency operations." *Id.* After IHS issued amendments clarifying the locations and scope of work, the bidding closed on March 29, 2019. *Id.*

Rear Admiral Weahkee relied on the third-party review in his testimony responding to questions by members of the Senate Indian Affairs Committee on March 12, 2019. *See* SIAC

Hearing, *see supra* note 12 (Ex. 11) at 41–43. The Committee's Vice-Chair, Senator Tom Udall

of New Mexico, asked why Weber was transferred and allowed to continue working for IHS

despite the many concerns raised about his behavior. *Id.* at 42. Weahkee responded:

> We have committed to conducting, via a third party contractor or vendor, *what we are framing as* a medical quality assurance review. We are going to have somebody who can come in and look objectively not only at the Indian Health Service records. We know who the people were in charge at the time in these various places, but we would like somebody to come in and interview not only our own employees, *but community members, tribal members, law enforcement, and others.*
>
> Much of what we learned about the case we learned from our partners at the Office of Inspector General and through the investigations conducted by the Federal Bureau of Investigation and the South Dakota Medical Board. We are gathering as much information as we can but we do not have the answers to those types of questions yet at this time.

*Id.* (emphasis added). The Committee's Chair, Senator John Hoeven of North Dakota, asked

Weahkee to further elaborate on the third-party review, and Weahkee responded:

> What we hope to do, objectively, again, with the third-party eye, is to have somebody *look back* and determine where the *missed opportunities* took place. We want to make sure that we gauge things against the policies that were in place at the time. Were those policies followed? If not, *where the breakdowns occurred and who should be held accountable for those policies not being put into place.*

*Id.* at 51 (emphasis added).

Senator Udall followed up with a written question to Rear Admiral Weahkee asking him

to "provide the Committee with any known facts surrounding Dr. Weber's move from the IHS

Billings Area to the IHS Great Plains Area after leadership became aware of his misconduct." *Id.*

at 65. In response, Weahkee again referred to what he described as the "intensive medical quality

assurance review of internal IHS past actions related to this provider. Questions involving

*historical issues and facts* will be fully addressed through this review." *Id.* (emphasis added).

The IHS issued a news release on May 13, 2019, announcing that it had awarded the contract to Integritas Creative Solutions LLC "to conduct a medical quality assurance review to examine whether laws, policies and procedures have been followed with regard to protecting patients from sexual abuse."[36] The statement said Integritas would conduct "a retrospective review to evaluate actions taken from 1986, when former IHS pediatrician Stanley Patrick Weber began working at IHS, to the present."[37] The HHS OIG later described the Integritas effort as

> an independent medical quality assurance review that will *assess IHS adherence to laws, policies, and procedures* aimed at protecting patients from *sexual abuse. The review will largely be retrospective* and will include medical record reviews from 1986 to present. The independent contractor will identify *system failures that may have contributed to IHS's inability to prevent or address Dr. Weber's patient abuse*, as well as determine any further improvements that IHS can implement to better protect patients.

OIG Report at 5 (emphasis added).

There is little public information available about Integritas. It has no website, and no list of its employees or their qualifications. However, the head of Integritas, Carl Caulk, states on his LinkedIn account that his experience includes 20 years as an official with the U.S. Marshals Service and seven years as a special agent with the Interior Department's Office of Inspector General; it lists no medical training or experience in providing medical care.[38] Similarly, the entry for Integritas in a commercial database of government contractors states that it "provides consultation, training and instruction to public and private entities in the following areas: security, law enforcement, compliance, ethics, investigations, threat mitigation, risk assessment,

---

[36] Press Release, IHS Principal Deputy Director Michael Weahkee statement on announcement of contract for medical quality assurance review (May 13, 2019), https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/Statement_MedicalQualityAssuranceReview_05132019.pdf (Ex. 27).

[37] *Id.*

[38] *See* https://www.linkedin.com/in/carl-caulk-69886a66/ (Ex. 28).

protective operations and protective intelligence."[39] Integritas was to be paid more than $688,000 in taxpayer funds for its work in connection with preparing its Report.[40]

Integritas performed a "fact-finding inquiry," as HHS now describes it, and provided its Report to IHS leadership in January 2020. Merrell Decl. ¶ 11, 14. But despite Rear Admiral Weahkee's pledges of transparency in his Congressional testimony, IHS refused to provide the Integritas Report to the public or to the Senate Indian Affairs Committee, which has oversight authority over IHS.[41] Members of the Committee strongly objected in letters to Health and Human Services Secretary Alex Azar and called for IHS to release the Integritas Report to the Committee and the public.

For example, both of Montana's senators wrote separately to Secretary Azar urging that the Integritas Report be made public with any sensitive information redacted.[42] In his letter, Senator Tester wrote: "[T]his lack of transparency demonstrates a complete disregard for Dr. Weber's victims, their families, and the future of the Indian Health Service." *Id.*

In another such letter, Senator Udall and three of his Indian Affairs Committee colleagues stated that IHS improperly invoked 25 U.S.C. § 1675 because the Integritas Report was not a

---

[39] *See* Integritas Creative Solutions, LLC, https://cage.report/DUNS/016541822 (Ex. 29).

[40] *See* https://govtribe.com/award/federal-contract-award/purchase-order-75h70419p00042 (purchase orders) (Ex. 30).

[41] *See* Letter from Sen. Tom Udall, et al., to Health and Human Services Secretary Alex Azar (Mar. 4, 2020), https://www.tomudall.senate.gov/imo/media/doc/2020-03-04%20LETTER%20HHS%20Integritas%20Report%20(Signed%20-%20Corrected)[1].pdf (Ex. 31).

[42] *See* Letter from Sen. Steve Daines to Health and Human Services Secretary Alex Azar (Feb. 24, 2020), https://www.daines.senate.gov/imo/media/doc/2020.01.24%20Letter%20to%20Sec%20Azar%20-%20Weber.pdf and Letter from Sen. Jon Tester to Health and Human Services Secretary Alex Azar (Mar. 3, 2020), https://www.tester.senate.gov/files/Letters/2020-03-03%20Weber%20Report%20Letter%20to%20Secretary%20Azar.pdf (Composite Ex. 32).

medical quality review and therefore "[t]here is no legal basis" for IHS to withhold it.[43] Indeed, Senator Udall, who had voted for the law establishing Section 1675, emphasized that, "[t]he law cited by IHS as the basis for its refusal to provide full disclosure, 25 U.S.C. 1675, relating to medical quality assurance records is inapposite; the audit is no such a record."[44] Even if the Report were subject to Section 1675, their letter continued, the statute explicitly states that it does not prevent providing such a report to a Congressional oversight committee.[45]

IHS has not made any public response to the Senators' calls for the release of the Integritas Report.

**E.**     ***The New York Times* and *The Wall Street Journal* Request the Report Under FOIA**

*The New York Times* filed a FOIA request for the Integritas Report on February 24, 2020. Merrell Decl. ¶ 17; *see also* Compl. ¶ 8 (Dkt. 1) ("*NYT* Complaint"). IHS acknowledged receipt of the request the next day and assigned it tracking number 20-063. *Id.* ¶ 9. IHS did not respond to The Times' request within the 20-day period for doing so under FOIA, or at any time before The Times filed suit two months later. *Id.* ¶ 10.

The *WSJ* also submitted a FOIA request for the Integritas Report on January 30, 2020. Merrell Decl. ¶ 17; *see also* Compl. ¶ 10, *Dow Jones & Company, Inc. & Christopher Weaver v. Department of Health and Human Services*, No. 1:20-cv-3145 (S.D.N.Y. filed Apr. 20, 2020) (Dkt. 1) ("*WSJ* Complaint"). IHS acknowledged receiving the request on the same day, and assigned it tracking number 20-044. *Id.* ¶ 11. The agency did not respond to the request within

---

[43] Letter from Sen. Tom Udall, at 1 & n.5 (Ex. 31).

[44] *Id.* at n.5.

[45] *Id.* (citing 25 U.S.C. § 1675(e)(2)).

the 20-day period for doing so under FOIA, or at any time before Dow Jones and Weaver filed

suit almost three months later. *Id.* ¶ 12.

F.    **The News Organizations' Lawsuits, and IHS's Belated Denial of the FOIA Requests**

Having not received any response to its FOIA request, The Times filed this lawsuit on

April 16, 2020, and Dow Jones and Weaver filed suit four days later. *See generally NYT*

Complaint; *WSJ* Complaint. Because both lawsuits seek access to the Integritas Report, all of the

parties requested via letter motion on May 19, 2020 that the cases be consolidated. *See* Dkt. 7.

This Court granted the motion and ordered the cases consolidated on June 30, 2020 (Dkt. 13).

The parties also jointly requested that the case be adjudicated for all purposes by Magistrate

Judge Gorenstein. *See* Dkts. 12 & 24 (20-cv-3145).

Meanwhile, a month after the two lawsuits were filed, IHS Acting FOIA Officer Evonne

Bennett belatedly denied both news organizations' FOIA requests in separate letters dated May

21, 2020. Merrell Decl. ¶ 18; *see also* Exs. 33 & 34 (denial letters to The Times and Dow Jones

and Weaver, respectively). Bennett stated that IHS was withholding the Integritas Report in full

under FOIA Exemption 3, citing 25 U.S.C. § 1675 as the statute purportedly prohibiting the

Report's release. *Id.* Neither letter asserted any other basis for withholding the Report. *Id.*

On June 11, 2020, HHS answered the *NYT* Complaint (Dkt. 10) and the *WSJ* Complaint

(Dkt. 21 in 20-cv-3145). Neither answer asserted any other basis for withholding the Report. *Id.*

After the Court directed the parties to submit a proposal for resolution of this case, they jointly

proposed a schedule for briefing cross-motions for summary judgment (Dkt. 14). This Court

endorsed that briefing schedule in an order issued the following day (Dkt. 15).

HHS filed its Motion for Summary Judgment on August 14, 2020 (Dkt. 20). The

Government asserted that the Integritas Report is a medical quality review record exempt from

disclosure pursuant to FOIA Exemption 3 and 25 U.S.C. § 1675. *Id.* at 6-10. HHS further asserted that the Integritas Report required confidentiality to encourage those interviewed to speak candidly, including that interviewees "had an expectation that the information they provided would be kept confidential." Dkt. 20 at 3; *see also* Merrell Decl. at ¶ 12 (same).

HHS also asserted for the first time in its summary judgment papers that it was withholding the Report in full under FOIA Exemption 5, claiming it is protected by the deliberative process privilege. *Id.* at 10-12. And, in a footnote, HHS asserted, without elaboration and despite the prior public dissemination of substantial information about the participants in the underlying events, that "certain information in the report" about "patients, staff and other individuals" could be withheld to protect personal privacy pursuant to FOIA Exemption 6. *Id.* at 16 n.4.

In response to these contentions, Plaintiffs are submitting herewith a declaration from Dr. Butterbrodt stating under oath that the Integritas interviewers to whom he spoke were former U.S. Marshals Service officials, not medical professionals; that the interview focused on administrative and criminal matters, not medical issues; and that he was not promised confidentiality to participate in the Integritas review. *See* Butterbrodt Decl. ¶¶ 10-13.

In sum, Weber's crimes and the IHS failures that facilitated them are no secret. They have been the subject of two public criminal trials, several public Congressional hearings, and public investigations by the OIG and a Presidential Task Force. The incompetence and misconduct at IHS in this case were *administrative* and *criminal*, not medical. Congress and the public have demanded answers about who at IHS failed Weber's victims and why and how those failures happened. IHS commissioned the Integritas Report to answer those questions. In the sections that follow, Plaintiffs explain why the law does not allow IHS to invoke a medical

review statute, or meritless privilege and privacy claims, to hide the report of the investigators the agency engaged to conduct this examination of its failures.

## **ARGUMENT**

The "basic purpose" of FOIA reflects "a general philosophy of full agency disclosure." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360 (1976); *accord Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7–8 (2001) ("[D]isclosure, not secrecy, is the dominant objective of the Act."). FOIA exists "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co*., 437 U.S. 214, 242 (1978). To that end, FOIA *requires* that Government records be made available to the public unless a statutory exemption applies. 5 U.S.C. § 552(a)(3)(A), (b)(1)-(9). "FOIA exemptions are to be construed narrowly," and there is a "strong presumption in favor of disclosure [that] places the burden on the agency to justify the withholding of any requested documents." *Assoc. Press v. Dep't of Def.*, 554 F.3d 274, 283 (2d Cir. 2009).

A court reviews *de novo* an agency's decision to withhold information from the public. 5 U.S.C. § 552(a)(4)(B). As a result, the agency's decision as to the applicability of a given exemption is entitled to no judicial deference. *See Bloomberg, L.P. v. Bd. of Governors of Fed. Reserve*, 601 F.3d 143, 147 (2d Cir. 2010). "Conclusory assertions of privilege will not suffice to carry the government's burden of proof in defending FOIA cases." *Assadi v. U.S. Citizenship & Immigration Servs.,* 2015 U.S. Dist. LEXIS 42544, at *13 (S.D.N.Y. Mar. 31, 2015) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980) (internal marks omitted)).

A.    **The Government Has Not Satisfied Its Burden of Justifying Withholding Under Exemption 3**

FOIA Exemption 3 permits agencies to withhold documents if they are "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). The crux of the Government's argument here is that the Integritas Report should be deemed a "medical quality assurance" report that is confidential under 25 U.S.C. § 1675. That provision of the Indian Health Care Improvement Reauthorization and Extension Act provides that "[m]edical quality assurance records created by or for any Indian health program or a health program of an urban Indian organization as part of a medical quality assurance program are confidential and privileged." 25 U.S.C. § 1675(b), (g). But the Government's attempt to dress up the Integritas Report as a review of medical care fails for three reasons: (a) it was written by a private consulting firm with no discernible medical expertise, (b) it examined the actions of an administrative agency— IHS—rather than a medical facility as the statute requires, and (c) it focused not on medical care but on criminal conduct and the agency's administrative mishandling of the employment and supervision of a pedophilic pediatrician for more than 20 years.

1.    **Section 1675 Is Limited to Records Reflecting Peer Review by Medical Professionals**

To trigger Exemption 3's coverage, the Government must meet two criteria. First, Exemption 3 applies only if "the statute invoked qualifies as an exemption 3 withholding statute." *A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 143 (2d Cir. 1994) (citing *CIA v. Sims*, 471 U.S. 159, 167 (1985)). Plaintiffs do not contest that Section 1675 is such a statute. This case instead turns on Exemption 3's second prong: whether "the materials withheld fall within that statute's scope." *Id.* The burden on the Government is to show that the withholding of the record at issue was "contemplated by Congress" or advances what the statute was "plainly intended" to accomplish. *Navasky v. CIA*, 499 F. Supp. 269, 274 (S.D.N.Y. 1980); *Assoc. Press*

*v. U.S. Dep't of Def.*, 2006 U.S. Dist. LEXIS 67913, at *31 (S.D.N.Y. Sep. 20, 2006), *rev'd on other grounds*, 554 F.3d 274 (2d Cir. Jan. 5, 2009); *see generally CIA v. Sims*, 471 U.S. at 170–73 (looking to the legislative history to determine the scope of a withholding statute under Exemption 3); *ACLU v. DOD*, 40 F. Supp. 3d 377, 387 (S.D.N.Y. 2014) (same); *Intellectual Prop. Watch v. U.S. Trade Rep.*, 205 F. Supp. 3d 334, 344–49 (S.D.N.Y. 2016) (same). The Government has failed to make that showing here.

Under Section 1675, medical quality assurance records are defined as "proceedings, records, minutes, and reports that (A) emanate from quality assurance program activities . . . and (B) are produced or compiled by or for an Indian health program or urban Indian organization as part of a medical quality assurance program." 25 U.S.C. § 1675(a)(3), (g). A "medical quality assurance program" is "any activity . . . by or for any Indian health program or urban Indian organization *to assess the quality of medical care.*" *Id.* at § 1675(a)(2) (emphasis added). Such activity may be carried out

> by or on behalf of individuals, Indian health program or urban Indian organization medical or dental treatment review committees, or other review bodies responsible for quality assurance, credentials, infection control, patient safety, patient care assessment (including treatment procedures, blood, drugs, and therapeutics), medical records, health resources management review, and identification and prevention of medical or dental incidents and risks.

*Id.* The common thread running through all those categories is medical treatment. The statute's language clearly limits its reach to activities undertaken by health care professionals related to the quality of medical care provided to patients—not a post-mortem of administrative failures undertaken by a governmental agency.

Few courts have interpreted 25 U.S.C. § 1675. But those that have emphasized that medical quality assurance records are those generated by a peer review process or are records that doctors or medical institutions produce to assess medical quality. In *Soto v. United States*,

2014 U.S. Dist. LEXIS 133134 (S.D. Cal. Sept. 22, 2014), the plaintiff alleged dental malpractice by an employee of the Southern Indian Health Council and sought discovery. The Government asserted that certain records – which included reports provided to and communications with a facility's quality control coordinator – were privileged under 25 U.S.C. § 1675. The court agreed. It found that the records "clearly [we]re the types of documents that a medical institution would produce and compile to assess its quality of patient care." *Id.* at *7.

Similarly, in *Parker v. United States,* 2020 U.S. Dist. LEXIS 24911 (D. Neb. Feb. 13, 2020), the administrator of the deceased's estate brought a wrongful death action against the Government, alleging that an IHS hospital failed to properly diagnose and treat the deceased. The government objected that several categories of documents the plaintiff sought were exempt from disclosure under 25 U.S.C. § 1675, including evaluations of the hospital by the Center for Medicare and Medicaid Services, performance evaluations of the health care providers, records regarding the providers' departure from IHS employment; and documents from the credentialing files of the relevant health care providers. *Id.* at *21-23. The court reasoned that the critical question was whether the records emanated from "activities to assess the quality of medical care at IHS." *Id.* at *28. The court concluded that "records emanating from IHS's credentialing" (the process used to "evaluate competency and appropriately grant medical staff membership and/or clinical privileges") or from IHS's "privileging review" ("the review of an individual practitioner's professional training, licensure, experience, and expertise") *did* involve assessing the quality of medical care[46] and thus "fit squarely within the medical quality assurance privilege." *Id.* at *25–26. The court also held, however, that documents unrelated to the quality of medical care, such as providers' attestations that they had reviewed the hospital's policies,

_____

[46] Indeed, the statute refers specifically to activity carried out by a "review bod[y] responsible for . . . credentials." 25 U.S.C. § 1675(a)(2).

were *not* privileged under Section 1675 *even if* they were included in the provider's credentialing file. *Id.* at *47.

The holding in *Kulik v. United States* undercuts HHS's broad claim here that the statute applies to every record tangentially related to the quality of medical care. 2016 U.S. Dist. LEXIS 84802, at *6-7 (D. Alaska June 28, 2016). There, a woman disabled by a stroke during prenatal hospitalization sought production of narratives written by her treating medical providers that were provided to HHS attorneys to "answer the allegation of negligence." *Id.* at *2. Section 1675 did not apply to the narratives because they were created for litigation purposes and HHS "cannot retroactively transform its litigation activities into a medical quality assurance program's activities merely by forwarding the claimant's records to risk management for medical review." *Id.* at *7. Here, IHS likewise cannot transform a review and analysis of its administrative failures regarding Weber into a record protected by Section 1675 simply by framing it as a "medical quality assurance" record and providing it to the agency's Office of Quality. Nothing in these decisions suggests that a report devoted to detecting and preventing crimes in IHS facilities qualifies as a medical quality assurance record.

Hoping to stretch the reach of the statute, the Government suggests that Section 1675 is not limited to records relating to reviews of the quality of medical care activities because the words "peer review" do not appear in the statute as they do in an analogous statutory provision that applies to the Department of Defense. (Gov't Br. at 8.)[47] But the legislative history of the Indian Health Care Improvement Reauthorization and Extension Act, 25 U.S.C. § 1601 *et seq.*, confirms that the statute was intended precisely to promote candor by practitioners in the peer

---

[47] Tellingly, the Government places the stress on the word "any" in the statutory phrase "any activity . . . by or for any Indian health program or urban Indian organization to assess the quality of medical care." (Gov't Br. at 8.) But the statute does not cover records related to just any activity; it must be an activity "to assess the quality of medical care." 25 U.S.C. § 1675(a)(2).

review process.[48] An official of the tribal consortium that operates IHS facilities in Alaska testified before the Senate Committee on Indian Affairs that the Indian Health Service worked at a disadvantage because existing laws "create[d] an inadvertent gap in protection for peer review activities that almost all other providers have, including providers for the Veterans' Administration and the Department of Defense."[49] The newly proposed medical quality assurance provision "would fill this inadvertent gap." *Id.*

Moreover, the Indian Health Service itself and the tribal health organizations it works with have consistently understood the aim of the statute to be the protection of peer review activities. A summary of the Indian Health Care Improvement Reauthorization and Extension Act on IHS's website states that the "Confidentiality of Medical Quality Assurance Records" provision "allows for peer reviews to be conducted within Indian health programs without

---

[48] The Government concedes that the same purpose that motivated the legislature to enact 25 U.S.C. § 1675 also underlies two analogous statutes applicable to the Department of Veterans Affairs and the Department of Defense. (Gov't Br. at 7–8.) *See Salazar v. United States*, 2018 U.S. Dist. LEXIS 96128, at *2–3 (S.D.N.Y. June 7, 2018) ("The purpose of protecting medical quality assurance documents from disclosure [under the Veterans Affairs quality assurance provision, 38 U.S.C. § 5705] is to encourage health professionals to be candid in their review of the quality of health care provided."); *Pope v. United States*, 2018 U.S. Dist. LEXIS 173716, at *6 (W.D. Wash. Oct. 9, 2018) (explaining that records are entitled to protection under the Department of Defense provision, 10 U.S.C. § 1102, when they are created by doctors in the context of "peer review activities" carried out "for the benefit of other surgeons in the department"); *see generally* S. Rep. 99-331, at 245-46 (1986) ("Central to these quality assurance review activities is the peer review process . . . . To be effective, this type of collegial review process must operate in an environment of confidentiality in order to elicit candid appraisals and evaluations of *fellow professionals*.").

[49] Reforming the Indian Health Care System: Hearing Before the S. Committee on Indian Affairs, 111th Cong. 159 (2009) (Response to written questions by Valerie Davidson of the Alaska Native Tribal Health Consortium), https://www.govinfo.gov/content/pkg/CHRG-111shrg53636/pdf/CHRG-111shrg53636.pdf (Ex. 35).

compromising confidentiality of medical records" and "[p]rovides protections for participants in the peer review process."[50]

There is no mystery as to why the statute would exempt records that reflect judgments of health care professionals about their peers and treat those records as uniquely privileged. Confidentiality assures that health care reviewers will act with candor, and that health care institutions will implement change, without fear that their words or the improved patient care will be used in litigation against them. The imperative of enhancing patient care and medical quality is not present when reports are prepared for other purposes, such as employee discipline, institutional oversight, or even a criminal investigation.[51]

### 2.   The Integritas Report Is Not a Medical Quality Assurance Record

Even if, as the Government claims, Section 1675 covers more than just peer review records, the Integritas Report cannot be shoehorned into the statute for several reasons. First, the statute on its face applies only to records created by a health care facility. The parent agency, IHS, is not one of the entities explicitly covered by Section 1675. The statute applies to records "produced or compiled by or for an Indian health program or urban Indian organization." 25

---

[50] Indian Health Service, IHCIA Reauthorization Summary Table (2010), https://www.ihs.gov/sites/newsroom/themes/responsive2017/display_objects/documents/IHCIA_Reauthorization_Summary_Table_IHS.pdf (Ex. 36). *See also* Northwest Portland Area Indian Health Board, Summary of Indian Health Care Improvement Act Provisions Passed in the Patient Protection and Affordable Care Act, http://leg.wa.gov/JointCommittees/Archive/HRI/Documents/May2010/IHCIASummary.pdf (summarizing statute the same way) (Ex. 37).

[51] Analogous state-law privileges also recognize the distinction between records generated for peer review purposes and records generated for investigative or institutional oversight purposes. *See, e.g.*, *Babcock v. Bridgeport Hosp.*, 251 Conn. 790, 824, 835 (1999) (holding that records created by hospital's Infection Control Officer, risk manager, and clinical services manager were not privileged because they did not concern "the substantive exchanges that transpire during the course of a peer review meeting"); *Yocabet v. UPMC Presbyterian*, 119 A.3d 1012, 1020-22 (Pa. Super. 2015) (ordering disclosure of investigation records generated by the Pennsylvania Department of Health because it was "not a professional health care provider and thus did not conduct peer review").

U.S.C. § 1675(a)(3)(B). The IHS does not meet the statutory definition of an "Indian health program," which is "any health program administered directly" by IHS or any tribal health program. 25 U.S.C. § 1603(12).[52] The law applies to programs administered by IHS which directly provide services to patients, not to the IHS administration that commissioned the Report (or to the Integritas risk management firm).[53] On that basis alone, the Government's argument fails.

Second, the Report is the product of an investigation into criminal behavior and the agency's failure to properly respond to complaints about Weber's wrongdoing. It has nothing to do with "assess[ing] the quality of medical care." 25 U.S.C. § 1675(a)(2). Weber plied teen boys with money, alcohol, and drugs and then raped them. That was not the provision of medical care, and IHS did not need a medical care quality assessment to determine that was wrongful behavior.

Rather, Rear Admiral Weahkee testified that IHS commissioned the Integritas Report to "look back and determine where the missed opportunities took place" to stop Weber and "where the breakdowns occurred and who should be held accountable for those policies not being put into place." SIAC Hearing at 51. He deflected senators' questions "involving historical issues and facts" about the Weber case and told the Senate Indian Affairs Committee that the Integritas Report would answer those questions. *Id.* at 65. In its RFP, IHS sought a firm that could produce "a comprehensive analysis" showing how the agency could "significantly improve the identification of, and response to, complaints of patient abuse, especially sexual abuse of

---

[52] An "urban Indian organization" is defined as "a nonprofit corporate body situated in an urban center, governed by an urban Indian controlled board of directors, and providing for the maximum participation of all interested Indian groups and individuals" that is capable of providing health services to Indians living in a particular urban area. 25 U.S.C. § 1603(29).

[53] *See also* Elayne J. Heisler, Cong. Research Serv., *The Indian Health Care Improvement Act Reauthorization and Extension as Enacted by the ACA: Detailed Summary and Timeline* (2014), at 29, https://crsreports.congress.gov/product/pdf/R/R41630 (Ex. 38).

minors." RFP at 2. The Report that resulted was authored by a third-party "risk assessment" and "protective intelligence" firm with no medical expertise, not by a physician or medical review board. Undoubtedly, preventing crimes in hospitals benefits patients—just as improvement in physical facilities or installation of a new computer system would—but those actions are not medical quality assurance actions.

The Government's own declarations and statements make the case that the Report is not about medical care. The Report was based on interviews with "community members, tribal members, law enforcement, and others," *see* SIAC Hearing at 42, and it documents instances of criminal behavior and the failures in administrative oversight that allowed that behavior to persist over decades, *see* Merrell Decl. ¶ 9. As IHS put it in the Request for Information, the Report was designed to assess "both a retrospective and current state of the agency's compliance with existing laws, regulations, and policies regarding patient safety and protection of patients from sexual abuse and assault." RFI at 2. The Report does not evaluate the use of a specific medical procedure, surgery technique, drug regimen, or any other medical activity. Criminal sexual abuse is not medical care, and a doctor forcing children to perform oral and anal sex is not medical treatment. *Cf. Grandstaff v. State*, 171 P.3d 1176 (Alaska Ct. App. 2007) (holding that records describing a doctor's pattern of sexual abusing patients, leading to the suspension of his medical license, were not privileged). Shielding the Integritas Report does nothing to promote candor in peer review activities, or to encourage "fellow professionals" in medicine to offer blunt appraisals of their colleagues' professional care to ensure changes are made to enhance health care quality. *See supra*, note 48.

If the Report were found to fall within the statute, it is hard to see any limiting principle. Staff relations at a hospital, the quality of waiting rooms, architectural or construction flaws in

hospitals, the signage and access roadways leading to the emergency room, or the criminal acts

of a staff member could all have an impact on the quality of medical care or patient safety.

Congress could have decided inquiries into those sorts of topics should be kept secret. It didn't. It

instead followed the established policy in the health care arena to maintain secrecy over peer

review and related processes. The statute was never intended to shield an agency from having to

talk honestly with the public about the findings of an investigation into criminal conduct and

agency mismanagement.

The Government misreads *Soto* and *Parker* to support its broad reading of Section 1675.

Gov't Br. at 8-9. They do not. The alleged malpractice in *Soto* was the severing of a lingual

nerve during oral surgery. 2014 U.S. Dist. LEXIS 133134, at *2. The records at issue were about

what went wrong with that surgery and thus were properly deemed confidential as a result. *Id.* at

*6-9. In *Parker*, the plaintiff sought credentialing records to help prove the underlying

allegations that a doctor misdiagnosed the decedent's diabetic ketoacidosis; the court held that

the records were privileged because determining the competency and qualifications of health

care providers to see patients was an activity that directly affected the quality of medical care.

2020 U.S. Dist. LEXIS 24911, at *25-26. By contrast, the Integritas Report is focused not on the

provision of medical care but on IHS's mishandling of a doctor who has already been criminally

charged, tried, convicted and sentenced for sexually abusing children. Indeed, IHS admits that

the Integritas review focused on issues "*relating to the reporting of allegations of sexual abuse*."

Gov't Br. at 9; Merrell Decl. ¶ 7 (emphasis added).

In fact, the Integritas Report is most closely parallel to the records that the *Parker* court

ordered disclosed, not those that were deemed confidential. In *Parker*, the court *permitted*

discovery of "audits, evaluations, and investigations" into the medical staff (one doctor and two

nurses), as well as "documents concerning corrective actions, remedial measures, practice changes, and procedure/policy changes, taken in response to any immediate jeopardy citations resulting from" the actions of three medical personnel, "to the extent those documents [were] not solely kept in a separate medical quality assurance file." 2020 U.S. Dist. LEXIS 24911, at *36-38. In so holding, the court recognized that investigative documents that were not part of a discrete medical quality assurance program lie outside the scope of the statute. *Cf.* Letter from Tom Udall, *supra* note 41 (referring to the Integritas Report as an "audit").

Finally and tellingly, the vendor hired to conduct the investigation has no apparent medical expertise. The head of Integritas, Mr. Caulk, served for 20 years as an official with the U.S. Marshals Service and also worked as a special agent with the Interior Department's Office of Inspector General. *See supra* note 38. Neither Integritas nor Mr. Caulk claims any medical experience or knowledge of any sort, and the Government does not assert that they do. It defies reason to think that a company without any discernible expertise in evaluating the quality of medical care brought in to investigate criminal activity was actually engaged in reviewing medical care.

**B.      The Government Has Not Met Its Burden of Justifying Withholding Under Exemption 5**

The Government also seeks cover under Exemption 5, which permits an agency to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The deliberative process privilege—which applies through Exemption 5, *see NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975)—protects from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath*, 532 U.S. at 8 (2001) (quoting

*Sears*, 421 U.S. at 150). The privilege does not sweep up every government document that relates in some way to an agency decision: To benefit from the protections of the privilege, the agency must establish that the information withheld is both pre-decisional and deliberative. *See Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999). Reasonably segregable factual information must be released. *See Envt'l Prot. Agency v. Mink*, 410 U.S. 73, 88–91 (1973); *Grand Central P'ship*, 166 F.3d at 482.

First, the Integritas Report is neither predecisional nor deliberative. A predecisional document is one "prepared in order to assist an agency decisionmaker in arriving at his decision," *Brennan Ctr. for Justice v. Dep't of Justice*, 697 F.3d 184, 194 (2d Cir. 2012). The Government asserts, conclusorily, that the Report was pre-decisional, but the agency's affidavit says nothing about how the Report relates in any way to agency decision-making. To the extent Weber's criminal wrongdoing prompted policy changes at IHS, those policy decisions were made *before* the Integritas Report was even solicited. *See* pp. 9-10 *supra*. On February 6, 2019—more than two weeks before IHS solicited bids from contractors for what ultimately became the Integritas Report—IHS issued new policies to combat child sexual abuse by health care providers, including stricter reporting requirements for suspected abuse and new rules about doctor-patient boundaries. *Id.* The Government does not assert, and there is no indication, that further policy decisions were made or contemplated based upon the Integritas Report. Further, the identity of the author belies any claim that the Report is pre-decisional: the Report is not "a document from a subordinate to a superior official," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980), but rather a Report commissioned from a third party by the highest levels of IHS.

Similarly, the Government says virtually nothing about how the Report "is intended to facilitate or assist development of the agency's final position on the relevant issue." *See Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014). It describes the Report as an "effort[] to review and analyze the agency's compliance with relevant [existing] laws, regulations and policies, to identify the relevant facts, to identify possible failures in IHS's processes, and to obtain advice regarding improvements IHS could implement to better protect patients and provide quality medical care." Gov't Br. at 12. But the Government has not established that the Report implicates the policymaking process in any way. *See Brennan Ctr. for Justice v. Dep't of Justice*, 697 F.3d at 194 (providing that a deliberative record must be "actually . . . related to the process by which policies are formulated"); *see also Adelante Ala. Worker Ctr. v. U.S. Dep't of Homeland Sec.*, 376 F. Supp. 3d 345, 357 (S.D.N.Y. 2019) ("The privilege does not 'protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-orientated judgment."). Nor has the Government shown that disclosure would confuse the public by "reflecting inaccurately" upon applicable policy or "prematurely disclos[ing]" a policy change, *Grand Cent.*, 166 F.3d at 482. The Government falls far short of its burden of describing with adequate specificity the decisionmaking process to which the Report pertains and the function and significance of the Report in that decisionmaking process. *See, e.g.*, *New York Times Co. v. U.S. Dep't of Defense*, 499 F. Supp. 2d 501, 515 (S.D.N.Y. 2007).

Second, under the 2016 FOIA Improvement Act, the government is required to show that disclosure would foreseeably harm the quality of agency decisionmaking, but it has not even

*attempted* to satisfy that burden. 5 U.S.C. § 552(a)(8)(A).[54] Congress specifically intended this provision to ensure that "agencies may no longer withhold information that is embarrassing or could possibly paint the agency in a negative light simply because an exemption may technically apply." 162 Cong. Rec. H3717 (2016) (Statement of Rep. Mark Meadows). Failing to even mention the foreseeable harm requirement, this Government has not met this "independent and meaningful burden." *NRDC v. United States EPA*, 2019 U.S. Dist. LEXIS 124353, at *2 (S.D.N.Y. July 25, 2019). News outlets across the country have already reported extensively on the underlying events, including numerous news articles and an hour-long PBS documentary. *See, e.g.*, Exs. 1 & 2. Members of Congress also have scrutinized at public hearings why IHS allowed Weber's abuse to persist for so long. *See* pp. 12-13 *supra*. Potential embarrassment or further public scrutiny into the agency's past actions is not a proper basis for withholding under a privilege that protects deliberations about a future policy. In light of what is already public about Weber's pattern of abuse and IHS's profound mishandling of sexual abuse complaints, it is neither logical nor plausible that releasing the full Report to the public would harm the quality of agency deliberations. While an agency might plausibly allege that release of internal deliberative documents generated by employees might discourage current and former employees from

---

[54] Congress enacted the FOIA Improvement Act to combat agencies' overuse of FOIA exemptions, especially Exemption 5. *See, e.g.*, 114 Cong. Rec. S1496 (2016) (Statement of Sen. Leahy) (noting the need to "reduce the perfunctory withholding of documents through the overuse of FOIA's exemptions"); Staff Report, U.S. House of Rep., Comm. On Oversight and Gov't Reform, *FOIA Is Broken: A Report* (Jan. 2016) (noting that agencies "overuse and misapply exemptions, withholding information and records rightfully owed to FOIA requesters"); S. REP. 114-4, at 3 (2015) (Statement of Sen. Grassley) (pointing to a "growing and troubling trend towards relying on these discretionary exemptions to withhold large swaths of Government information, even though no harm would result from disclosure," and noting that federal agencies used Exemption 5 41% more in 2012 than in the previous year); FOIA Oversight and Implementation Act of 2015, H.R. Rept. No. 114-391, at 10 ("The deliberative process privilege is the most used privilege and the source of the most concern regarding overuse. . . . [It] has become the legal vehicle by which agencies continue to withhold information about government operations.").

participating in future "deliberations," that risk is non-existent when the supposed deliberations at issue are a one-time study done by an outside vendor, following numerous other government reports and news coverage in which may of those people have already spoken up.

Third, the Report, produced by a third-party contractor, offered an independent assessment of the agency's response to complaints regarding sexual abuse and is not an intra-agency record. Under the so-called "consultant corollary," some courts have permitted agencies to exempt from disclosure *policymaking* advice from outside experts, just as the privilege permits withholding of internal *policy* recommendations. In the Second Circuit, the consultant corollary is interpreted narrowly and exempts from disclosure only "documents submitted to the agency by . . . outside consultants to assist it in rendering an informed decision" in the context of a rule-making process. *Lead Indus. Ass'n v. OSHA*, 610 F.2d 70, 83 (2d Cir. 1979); *see also Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 73, 77 (2d Cir. 2002) ("[A]gencies may require assistance from outside consultants in formulating policy"). Courts in this Circuit have rejected attempts to broaden the consultant corollary beyond those narrow contours. *See, e.g.*, *Welby, Brady & Greenblatt, LLP v. U.S. Dep't of Health & Human Servs.*, 2016 U.S. Dist. LEXIS 56605, at *22–23 (S.D.N.Y. Apr. 27, 2016).[55]

---

[55] Moreover, the consultant corollary has been the subject of heavy criticism and has been rejected by the Sixth and Ninth Circuits as "contrary to Exemption 5's text and FOIA's purpose to require broad disclosure." *Rojas v. FAA*, 927 F.3d 1046, 1055 (9th Cir. 2019); *see Lucaj v. FBI*, 852 F.3d 541, 549 (6th Cir. 2017). In support of its contention that the consultant corollary nevertheless extends to the Integritas Report, the Government disregards all this precedent, and instead cites case law from the District of Columbia Circuit. (Gov't Br. at 10 n.3 (citing *Nat'l Inst. of Military Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 684 (D.C. Cir. 2008)). But this Court has emphatically rejected the broad view of the consultant corollary adopted by the D.C. Circuit in the *National Institute of Military Justice* case. As the Court explained in *Fox News Network, LLC v. U.S. Department of the Treasury*, while "the D.C. Circuit has adhered to its expansive view of the intra- or inter-agency requirement in varying contexts," the Second Circuit "has never endorsed" that expansive interpretation. 739 F. Supp. 2d 515, 539 (S.D.N.Y. 2010).

The Integritas Report has little to do with rulemaking or "formulating policy." Indeed, the Government acknowledges that "the purpose" of the Report was to conduct a factual investigation, and then to assess the effectiveness of, and evaluate IHS's adherence to, policies and procedures that were already in place (Gov't Br. at 11), not to rewrite the policy. *See* RFI at 2; OIG Report at 5. And the risk mitigation firm, which was hired precisely to provide an *independent* assessment of where the agency went wrong (or, in Rear Admiral Weahkee's words, a "third-party eye," *see* SIAC Hearing, at 51), did not "function[] as an arm" of the agency, as a "pure objective proxy for the agency," or "like the agency's own personnel." *Klamath*, 532 U.S. at 12; *Intellectual Prop. Watch v. U.S. Trade Rep.*, 134 F. Supp. 3d 726, 748 (S.D.N.Y. 2015); *Welby*, 2016 U.S. Dist. LEXIS 56605, at *22–23. Characterizing Integritas as a *de facto* arm of IHS would directly contradict Admiral Weahkee's focus on the independent nature of the investigation in attempting to assuage senators' concerns that those responsible for enabling Weber's crimes would escape accountability.

Moreover, protecting from disclosure a Report by an outside contractor does little to protect the candor of agency deliberations. Disclosing Integritas's findings and analysis of IHS process failures would not plausibly chill deliberations by agency employees or force "agencies . . . to operate in a fishbowl." *Brennan Ctr. for Justice v. Dep't of Justice*, 697 F.3d at 194. Because Integritas is an outside risk assessment firm and was not providing expert input into a rulemaking process, the Integritas Report lies outside the narrow scope of the consultant corollary as applied in this Circuit.

Finally, even if this Court were to conclude that the Integritas Report were a deliberative intra-agency record, the deliberative process privilege does not justify blanket withholding. The Government must disclose all reasonably segregable "purely factual, investigative" material

36

contained in the Integritas Report. *Mink*, 410 U.S. at 88-89 (1973); *see also, e.g.*, *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993) ("[T]he agency bears the burden of showing that no [non-exempt] segregable information exists."). The Report undeniably comprises factual information unearthed through the investigation. IHS's official solicitation of a contractor to conduct the investigation noted that "[t]he contractor will perform a fact-finding inquiry and record review" and that one of the key "objectives of the review will be [to] identify facts relating to IHS's policies and procedures." RFP at 2. And the Government admits that the final Report contains detailed facts, expressly stating that, "[i]n its report, Integritas detailed its factual findings." (Gov't Br. at 9; Merrell Decl. ¶ 14.) At a minimum, such factual findings are not protected under Exemption 5.[56]

## C.   <u>At a Minimum, In Camera Review Is Warranted</u>

In light of the Government's failure to "provide a detailed justification for" its decision not to release a single word of the Integritas Report, *Johnson v. Exec. Office for United States Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002), if this Court has any doubts as to the permissibility of the agency's blanket withholding, it should not hesitate to exercise its discretion to conduct *in*

---

[56] In addition to its Exemption 3 and Exemption 5 arguments, the Government, in a footnote, asserts that Exemption 6 would also exempt from disclosure certain, unspecified "information about patients, staff, and other individuals" in the Report. (Gov't Br. at 12.) The Government says nothing more about the type of information it is withholding or the identities of the "staff" or "other individuals" at issue. Plaintiffs do not contest, for the purposes of this motion, the Government's right to redact the names of patient victims who have not previously been identified in public reporting. But as to any information beyond that, the Government's "[c]onclusory assertion[] of privilege" does not satisfy its burden to justify nondisclosure. *Assadi*, 2015 WL 1500254, at *5. In particular, identification of agency staff who are implicated in the agency's mishandling of complaints goes to the core of FOIA's purpose—permitting the public to understand government operations and to exercise its essential oversight role. The agency's half-hearted attempt to assert Exemption 6, with no supporting factual evidence about whose names are included, why they have a privacy interest in remaining unnamed, and why that interest outweighs the public interest, is plainly insufficient to meet its burden of justifying withholding.

*camera* review. *See* 5 U.S.C. § 552(a)(4)(B) (the court "may examine the contents of . . . agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section"); *Halpern v. F.B.I.*, 181 F.3d 279, 292 (2d Cir. 1999) (finding *in camera* review proper "where it might be possible that the agency had exempted whole documents simply because there was some exempt material in them").

Courts regularly conduct *in camera* review—including to assess whether a record is a medical quality assurance record. *Soto*, 2014 U.S. Dist. LEXIS 133134, at n.1 ("Notwithstanding [25 U.S.C. § 1675's] prohibition of disclosure of privileged documents, *in camera* review by the Court is appropriate to determine whether the documents are privileged."); *Salazar*, 2018 U.S. Dist. LEXIS 96128, at *1 ("At the Court's direction, Defendant provided the Report for *in camera* review on May 22, 2018" to determine the applicability of 38 U.S.C. § 5705). Moreover, given that just one document is at issue here, the Court's review of the Integritas Report would not be onerous. *See, e.g.*, *Shinnecock Indian Nation v. Kempthorne*, 652 F. Supp. 2d 345, 356 n.6 (E.D.N.Y. 2009) (conducting in camera review of documents partially withheld under Exemption 5 given that the small number of documents made "the burden of *in camera* review relatively light."); *Neuman v. United States*, 70 F. Supp. 3d 416, 425 & n.8 (D.D.C. 2014) (ordering *in camera* review based on small number of documents—in that case, approximately 73 pages); *Hall v. CIA*, 881 F. Supp. 2d 38, 74 (D.D.C. 2012) (noting that "*in camera* inspection may be particularly appropriate . . . when the number of withheld documents is relatively small").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court: (i) to deny IHS's motion for summary judgment and to grant Plaintiffs' cross-motion for summary judgment; (ii) to direct IHS to make the Report public within 20 days; (iii) to award Plaintiffs the costs of this proceeding, including reasonable attorney's fees, as expressly permitted by FOIA, 5 U.S.C. § 552(a)(4)(E); and (iv) to grant such other and further relief as the Court deems just and proper.

Dated: New York, NY
September 14, 2020

Respectfully submitted,

By: /s/*Matthew E. Kelley*
    Seth D. Berlin
    Matthew E. Kelley (admitted *pro hac vice*)
Ballard Spahr LLP
1909 K Street, NW
12th Floor
Washington, DC 20006-1157
Phone: 202-508-1122
Fax: 202-661-2299
Email: berlins@ballardspahr.com
    kelleym@ballardspahr.com

*Counsel for Plaintiffs Dow Jones & Company, Inc.
and Christopher Weaver*

David E. McCraw
Al-Amyn Sumar
Alexandra Perloff-Giles
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: 212-556-4031
Fax: (212) 556-4634
Email: mccrad@nytimes.com
    al-amyn.sumar@nytimes.com
    aperloffgiles@nytimes.com

*Counsel for Plaintiff The New York Times Company*