UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
THE NEW YORK TIMES COMPANY,                        :
                                                   :
                          Plaintiff,               :
                                                   :  OPINION AND ORDER
                                                   :
                   -v.-                             :
                                                   :  20 Civ. 3063 (GWG)
DEPARTMENT OF HEALTH & HUMAN                        :
SERVICES,                                          :
                                                   :
                          Defendant.               :
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

　　This Freedom of Information Act suit was brought by The New York Times, The Wall

Street Journal and a reporter seeking to force the Indian Health Service ("IHS") to release a

report that it commissioned from a private consultant to investigate numerous acts of rape and

sexual abuse committed by Stanley Patrick Weber, a former IHS pediatrician, against Native

American children.  IHS has taken the position that the report is protected from disclosure by a

statute that affords confidentiality to reports on the "quality of medical care" — a position we

reject.  We also find that the report is not protected under the litigation privilege exemption of

the Freedom of Information Act and thus order that it be produced.

I.  BACKGROUND

　　This case consists of two consolidated actions brought under the Freedom of Information

Act, 5 U.S.C. § 552 ("FOIA") against the United States Department of Health and Human

Services ("HHS"), which oversees IHS.  The parties have cross-moved for summary judgment.[1]

---

[1]  See Notice of Motion for Summary Judgment, filed Aug. 14, 2020 (Docket # 19);
Defendant's Memorandum of Law in Support of Motion for Summary Judgment, filed Aug. 14,

As noted, plaintiffs seek a report commissioned by IHS to investigate the actions of

Stanley Patrick Weber, a former IHS pediatrician who was convicted in September 2018 and

again in September 2019 for sexual abuse of Native American children.  Merrell Decl. ¶¶ 7-8;

Press Release, Department of Justice, Convicted Former Pine Ridge Indian Health Service

Pediatrician Sentenced to Five Consecutive Life Sentences for Multiple Sex Offenses Against

Children (Feb. 10, 2020), annexed as Exhibit 17 to Kelley Decl.  Weber's indictments attracted

media attention and The Wall Street Journal jointly investigated Weber's crimes with Frontline

PBS, resulting in a published article and documentary in February 2019.  Christopher Weaver et

al., A Pedophile Doctor Drew Suspicions for 21 Years.  No One Stopped Him., Wall St. J., Feb.

8, 2019, at 1, annexed as Exhibit 1 to Kelley Decl.

In the aftermath of Weber's first conviction, IHS responded to the controversy in a

number of ways relevant to this lawsuit.  First, on October 16, 2018, IHS issued a "Sources

Sought Notice" announcing its intention "to perform an internal patient safety medical quality

assurance review of the [IHS's] policies and procedures regarding the reporting of allegations of

sexual abuse of IHS patients by IHS clinical staff," noting that this would involve "a review of

whether policies and procedures have been and are being followed with regard to protecting

patients from sexual abuse by providers in the health care delivery environment, and to identify

_____

2020 (Docket # 20) ("Def. Mem."); Declaration of Jonathan Merrell, filed Aug. 14, 2020
(Docket # 21) ("Merrell Decl."); Notice of Plaintiffs' Cross-Motion for Summary Judgment,
filed Sept. 14, 2020 (Docket # 22); Plaintiffs' Memorandum of Law in Support of Cross-Motion
for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, filed
Sept. 14, 2020 (Docket # 23) ("Pl. Mem."); Declaration of Mark. P. Butterbrodt, filed Sept. 14,
2020 (Docket # 24) ("Butterbrodt Decl."); Declaration of Matthew E. Kelley, filed Sept. 14,
2020 (Docket # 25) ("Kelley Decl."); Defendant's Reply Memorandum in Further Support of Its
Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment,
filed Oct. 12, 2020 (Docket # 26) ("Def. Reply"); Plaintiff's Reply Memorandum in Further
Support of Plaintiffs' Motion for Summary Judgment, filed Nov. 2, 2020 (Docket # 28) ("Pl.
Reply").

any improvements IHS could implement to better protect both patients and staff."  Sources

Sought Notice at 1-2, posted Oct. 16, 2018, annexed as Exhibit 24 to Kelley Decl. ("Sources

Sought Notice").  Second, IHS's then-acting head, Rear Admiral Michael Weahkee, issued a

"Dear Tribal Leader" letter on October 26, 2018, stating that IHS had "taken immediate steps to

affirm and enhance safeguards to protect our patients," including "[d]rafting a new policy to

further stress zero tolerance for abuse of children," and "[i]nitiating an internal patient safety

medical quality assurance review."  Letter from Michael D. Weahkee at 1, dated October 26,

2018, annexed as Exhibit 20 to Kelley Decl.

On February 6, 2019, IHS updated the Indian Health Manual with a new chapter, entitled

"Protecting Children from Sexual Abuse by Health Care Providers."  See Transmittal Notice 19-

03 at 1, dated Feb. 6, 2019, annexed as Exhibit 21 to Kelley Decl.  As noted in the transmittal

notice, the new chapter was meant "to provide professional standards and guidance to protect

against sexual abuse or exploitation of children by health care providers."  Id.  The new policies

included requirements that chaperones be allowed during examinations of children and

requirements regarding reporting suspected child abuse.  See U.S. Dep't of Health and Human

Services, Office of Inspector General, Indian Health Service Has Strengthened Patient Protection

Policies but Must Fully Integrate Them into Practice and Organizational Culture 8-12 (2019),

annexed as Exhibit 8 to Kelley Decl. ("OIG Report").

A few weeks later, on February 22, 2019, "IHS issued a contracting opportunity to find a

contractor to perform" the purported "medical quality assurance review[.]"  Merrell Decl. ¶ 7;

see also Solicitation Number: IHS-19-236-SOL-00002, annexed as Exhibit 26 to Kelley Decl.

(the "Solicitation").  The Solicitation stated that "IHS intends to perform an internal patient

safety medical quality assurance review of the Indian Health Service's (IHS) policies and

3

procedures regarding the reporting of allegations of sexual abuse of IHS patients by IHS clinical

staff." Solicitation at 2. It described its scope as follows:

> We seek a comprehensive analysis showing how IHS could significantly improve the identification of, and response to complaints of patient abuse, especially sexual abuse of minors. The contractor will perform a fact-finding inquiry and record review at the Oklahoma Area IHS, Billings Area IHS and Great Plains Area IHS, and IHS Headquarters in Rockville, MD. The period of the records to review are from 1986 to 2018.

Id. The Solicitation further described the following objectives:

> (a) identify facts relating to IHS's policies and procedures regarding the reporting of allegations of sexual abuse of IHS patients by clinical staff; (b) identify any possible process or system failures and the contributing causes of any such process or system failures; and (c) make recommendations for improvement.

Id. The Solicitation noted that the review was specifically meant to both

> assess how effective agency policies have been since 1986, and to develop and/or improve policies and procedures that focus on:
> a. Timely reporting of suspected or known sexual abuse of IHS patients by IHS providers to appropriate authorities;
> b. Supervisory or other line management handling of reported suspicion of sexual abuse;
> c. Prompt action to temporarily remove a suspected abusive provider out of the work environment to facilitate an administrative or criminal investigation;
> d. Providing timely and complete information to support internal or external reviewers or investigators to promote an effective and informative investigation;
> e. Taking prompt and effective remedial action on specific conclusions reached in an investigation;
> f. Avoiding a transfer or "passing around" within the agency of problem providers or other staff.

Id. at 2-3. The Solicitation stated that, within 180 days of being awarded the contract, the

contractor should "[s]ubmit a final written report to IHS with recommendations for improvement

and elimination of root causes." Id. at 4. The Solicitation also noted that "[i]nformation

supplied to the Contractor in connection with the work will include private, personnel sensitive,

and HIPAA protected information. The Contractor must maintain the confidentiality of this

information and use it only to perform the work contemplated . . . ." Id.  Representatives from

the Contractor were required to sign non-disclosure agreements.  Id.  The Solicitation warned

that breaching such confidentiality could result in "penalties as provided by law."  Id.

In May 2019, IHS awarded the contract to Integritas Creative Solutions LLC.  See

Merrell Decl. ¶ 10.  Integritas then "performed a fact-finding inquiry and record reviews" at

various IHS locations, and also interviewed "current and former IHS employees, community

members, tribal members, law enforcement, and others."  Id. ¶ 11.  Eight months later, in

January 2020, Integritas provided IHS with its final product – a document we will refer to as the

"Report."  IHS characterizes it as "a report detailing [Integritas's] review, its conclusions, and its

recommendations for protecting IHS patients and thereby ensuring their access to proper medical

care."  Id. ¶ 14.  The Report on its first page and repeatedly thereafter identifies itself as "medical

quality assurance review."

Shortly after the Report was completed and delivered to IHS, the plaintiffs in these cases

submitted requests for copies of the Report.  Id. ¶ 17.  IHS replied to those requests by stating

that the Report "is a privileged and confidential medical quality assurance record under 25

U.S.C. § 1675."  Letter from Evonne Bennett at 1, dated May 21, 2020, annexed as Exhibit 33 to

Kelley Decl. ("IHS Letter").  Accordingly, the "entire report(s) is privileged and confidential

under 25 U.S.C. § 1675, and is also being withheld in full pursuant to Exemption 3 of the

FOIA . . . ." Id.

These lawsuits followed.  After briefing was completed, the Court ordered and

subsequently reviewed the Report in camera as permitted by 5 U.S.C. § 552(a)(4)(B).  See Order,

filed November 20, 2020 (Docket # 29).

## II. LEGAL STANDARD

FOIA's purpose is to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978) (citations omitted); accord Nat'l Archives & Record Admin. v. Favish, 541 U.S. 157, 171 (2004) ("FOIA is often explained as a means for citizens to know what their Government is up to.") (quotation marks and citation omitted); Associated Press v. U.S. Dep't of Def., 554 F.3d 274, 283 (2d Cir. 2009) ("[FOIA] was designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.") (quotation marks and citation omitted). FOIA favors disclosure and "any member of the public is entitled to have access to any record maintained by a federal agency, unless that record is exempt from disclosure under one of the Act's nine exemptions." A. Michael's Piano, Inc. v. FTC, 18 F.3d 138, 143 (2d Cir. 1994); accord Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys., 601 F.3d 143, 147 (2d Cir. 2010); Associated Press, 554 F.3d at 283. Federal courts conduct a de novo review of an agency's decision to withhold records requested under FOIA, Bloomberg, 601 F.3d at 147, and all statutory exemptions must be construed narrowly, id.; accord Associated Press, 554 F.3d at 283. Materials falling within the terms of a FOIA exemption, however, need not be disclosed. See, e.g., Associated Press, 554 F.3d at 283-84; Halpern v. FBI, 181 F.3d 279, 287 (2d Cir. 1999).

To prevail on a motion for summary judgment in a FOIA action, the government "has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994); accord Bloomberg, 601 F.3d at 147; Associated Press, 554 F.3d at 283. "[A]ll doubts as to the applicability of the exemption must be resolved in favor of disclosure." Florez v. Cent.

6

Intelligence Agency, 829 F.3d 178, 182 (2d Cir. 2016) (quotation marks and citation omitted).

Additionally, under the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538, it is not enough for the Government to show that an exemption applies.  Rather, the Government must also demonstrate that "(i) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or (ii) disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A).  "Stated differently, pursuant to the FOIA Improvement Act, an agency must release a record — even if it falls within a FOIA exemption — if releasing the record would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law."  Nat'l Day Laborer Org. Network v. United States Immigration & Customs Enf't, 2020 WL 5518114, at *7 (S.D.N.Y. Sept. 14, 2020) (quoting Rosenberg v. U.S. Dep't of Def., 342 F. Supp. 3d 62, 73 (D.D.C. 2018)).

Summary judgment may be granted on the basis of "affidavits or declarations supplying facts . . . giving reasonably detailed explanations why any withheld documents fall within an exemption."  Carney, 19 F.3d at 812 (footnote and citation omitted); accord Associated Press v. U.S. Dep't of Justice, 549 F.3d 62, 65 (2008).  Allegations contained in such an affidavit must be provided a "presumption of good faith."  Carney, 19 F.3d at 812 (quotation marks and citation omitted).

## III.  DISCUSSION

The only issue in this case is whether the Report properly falls within an exemption asserted by IHS.  While IHS initially asserted that the Report was withheld only "pursuant to Exemption 3" (IHS Letter at 1), at summary judgment HHS advances the additional arguments that the Report may be withheld under Exemption 5 and Exemption 6.  We address each exemption in turn.

A.  Exemption 3

Exemption 3 allows an agency to withhold documents that are "specifically exempted

from disclosure by statute" as long as the statute "requires that the matters be withheld from the

public in such a manner as to leave no discretion on the issue" or "establishes particular criteria

for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).

"[T]he sole issue for decision is the existence of a relevant statute and the inclusion of withheld

material within the statute's coverage."  Wilner v. Nat'l Sec. Agency, 592 F.3d 60, 72 (2d Cir.

2009) (quoting Ass'n of Retired R.R. Workers v. U.S. R.R. Retirement Bd., 830 F.2d 331, 336

(D.C. Cir. 1987); accord A. Michael's Piano, Inc. v. F.T.C., 18 F.3d 138, 143 (2d Cir. 1994)

(citations omitted).

The statute invoked by HHS here is 25 U.S.C. § 1675, which provides in pertinent part

that

> Medical quality assurance records created by or for any Indian health program or
> a health program of an urban Indian organization as part of a medical quality
> assurance program are confidential and privileged. Such records may not be
> disclosed to any person or entity . . . .

§ 1675(b).  The statute defines a "medical quality assurance record" as "the proceedings, records,

minutes, and reports that — (A) emanate from quality assurance program activities . . . ; and (B)

are produced or compiled by or for an Indian health program or urban Indian organization as part

of a medical quality assurance program."  Id. § 1675(a)(3).  A "medical quality assurance

program" is defined as "any activity carried out . . . by or for any Indian health program or urban

Indian organization to assess the quality of medical care . . . ."  Id. § 1675(a)(2). [2]  The statute

---

[2]  25 U.S.C. § 1675(a)(2)  gives examples of such an "activity" by stating that it includes
**Error! Main Document Only.**activities conducted by or on behalf of individuals, Indian health
program or urban Indian organization medical or dental treatment review committees, or other

states that the records within its scope "may not be made available to any person under" FOIA.
Id. § 1675(g).

To address the question of whether the Report is within the statute's coverage, HHS
relies largely on the agency's public statements in soliciting the report.  It argues that because
"IHS and the Office of Quality, which is specifically responsible for quality assurance,
commissioned a medical quality assurance review to assess issues relating to patient safety and
the quality of patient care . . . [the Report] was plainly within the scope of § 1675."  Def. Reply
at 10.  It also points to the declaration of the IHS's Deputy Director for Quality, Jonathan
Merrell, who asserts that "IHS including the Office of Quality concluded that a medical quality
assurance review was necessary to determine what steps IHS could take to correct the patient
safety and medical care issues arising from Stanley Patrick Weber's sexual abuse of minors
while he was employed as a pediatrician by IHS."  Merrell Decl. ¶ 7.

The Report here was of course commissioned by and for the IHS, not a particular "Indian
health program or a health program of an urban Indian organization."  25 U.S.C. § 1675(a)(2).
Thus, it is unclear whether the Report comes within the statute at all — a matter contested by the
plaintiffs.  See Pl. Mem. at 27-28.  It is not necessary to reach this issue, however, because HHS
has not met its burden of demonstrating that the Report is the record of an activity "to assess the
quality of medical care" under 25 U.S.C. § 1675(a)(2).

HHS seems to believe that the IHS's own characterization of the document is sufficient to
dispose of this question.  Def. Reply at 10.  We disagree.  Rather, it is the Court's responsibility

---

review bodies responsible for quality assurance, credentials, infection control, patient safety,
patient care assessment (including treatment procedures, blood, drugs, and therapeutics), medical
records, health resources management review, and identification and prevention of medical or
dental incidents and risks."

under FOIA to make a <u>de</u> <u>novo</u> determination of whether the material withheld fits within a statutory exemption.  <u>See</u>, <u>e.g.</u>, <u>Bloomberg</u>, 601 F.3d at 147 ("The agency's decision that the information is exempt from disclosure receives no deference; accordingly, the district court decides <u>de novo</u> whether the agency has sustained its burden.") (citation omitted).  While in our view HHS has not met its burden of showing that the Report is the record of an activity "to assess the quality of medical care" under § 1675(a)(2) through the declaration it has submitted, we have as a matter of caution examined the Report itself <u>in</u> <u>camera</u> to determine whether it fits within the statute.

Our examination shows that, although the Report parrots the statute by asserting it is an "internal medical quality assurance review," the Report itself does not reflect an analysis of the "quality of medical care," 25 U.S.C. § 1675(a)(2).  Rather, it consists of (1) a recounting of the factual circumstances of Weber's predation on children (most of which occurred in his home or at his office outside of normal clinic hours), along with a recounting of some scattered instances of other employees, including some non-medical practitioners, engaging in sexual misconduct involving children; (2) an analysis of the systemic bureaucratic failures demonstrated by the actions of administrators within the IHS; and (3) recommendations to improve the reporting of sexual abuse.  The term "medical care" hardly appears in the Report, and never in relation to the assessment of medical care that was given to any patient.  The Report is about sexual abuse of children by an IHS doctor — what happened to them, how employees of the IHS and others allowed it to happen, and actions that might be taken to prevent it in the future.  The "quality of medical care" as that term is normally understood is simply not part of the Report.

HHS asserts that the "presence" of criminal conduct should not "preclude the undertaking of a medical quality assurance review."  Def. Reply at 9.  If the Report actually constituted an

assessment of the quality of medical care, the Court would agree that the "presence" of criminal conduct would not detract from the Report's status as medical quality assurance record. But this Report does not constitute an assessment of quality of medical care provided to Indian children with some mentions of criminal conduct. The entire Report is entirely and exclusively about criminal conduct unrelated to medical care and the failures of the agency in detecting and preventing that criminal conduct. There is literally nothing in the Report that could be characterized as an assessment of the quality of the medical care provided to IHS patients. To come within the statute, the focus of the "record" being withheld must be on the provision of "medical care." 25 U.S.C. §§ 1675(a)(2), (3). This is not such a record.

HHS argues that the Report "relat[es] to the safety of IHS patients and ensuring their access to proper medical care." Def. Reply at 4; see also id. at 9 (Weber's sexual abuse "affected" patient safety and the quality of medical care). In the same vein, Merrell asserts that the purpose of the Report was "to determine what steps IHS could take to correct the patient safety and medical care issues arising from Stanley Patrick Weber's sexual abuse of minors while he was employed as a pediatrician by IHS." Merrell Decl. ¶ 7. It is simply incorrect to state, however, that the Report represents an effort to identify steps to correct "medical care" issues inasmuch as there is no assessment of the quality of medical care in the report. Certainly, not being sexually abused by a doctor could only result in a patient obtaining better "medical care" and would cause the patient to be more "safe[]" than would be the case otherwise. But this fact does not convert the substance of the Report into an assessment of the "quality of medical care" within any normal understanding of that phrase. The Report itself is exclusively an assessment of Weber's and others' sexual crimes and the bureaucratic failures that let their conduct go unpunished — it is not an assessment of the "quality of medical care." The issue of

11

sexual abuse is entirely collateral to the provision of medical care.  As an analogy, it might be said that not hiring disreputable general contractors who build health care facilities with structural defects would improve the quality of medical care and patient safety because it would prevent the facilities from collapsing on and injuring patients.  But that would not mean that a report on the agency's practice of hiring of such contractors constitutes an assessment of the "quality of medical care" protected by 25 U.S.C. § 1675.  The same is true here with respect to Weber's engaging in sexual abuse.  It has nothing to do with medical care and thus the Report does not come within the statute.

    B.  <u>Exemption 5</u>

        1.  <u>Law on Deliberative Process</u>

HHS argues that the Report may be withheld pursuant to 5 U.S.C. § 552(b)(5) ("Exemption 5").  Exemption 5 permits an agency to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ."  <u>Id.</u>  The exemption protects from disclosure "agency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules."  <u>Tigue v. U.S. Dep't of Justice</u>, 312 F.3d 70, 76 (2d Cir. 2002) (quotation marks and citation omitted).  One such category of documents are documents protected by the "deliberative process privilege," which is "encompassed within the executive privilege."  <u>Grand Cent. P'ship, Inc. v. Cuomo</u>, 166 F.3d 473, 481 (2d Cir.1999).  Here, HHS argues that the Report should be withheld pursuant to the deliberative process privilege.  Def. Mem. at 10.

The deliberative process privilege shields from disclosure intra-agency or inter-agency "'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  <u>Dep't of the Interior</u>

v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001) (quoting NLRB v. Sears,

Roebuck & Co., 421 U.S. 132, 150 (1975)).  Restated, the privilege protects "recommendations,

draft documents, proposals, suggestions, and other subjective documents which reflect the

personal opinions of the writer rather than the policy of the agency."  Grand Cent. P'ship, 166

F.3d at 482 (quotation marks and citations omitted).  The privilege

> rests on the obvious realization that officials will not communicate candidly among
> themselves if each remark is a potential item of discovery and front-page news, and its
> object is to enhance the quality of agency decisions by protecting open and frank
> discussion among those who make them within the Government.

Klamath, 532 U.S. at 8-9 (quotation marks and citations omitted).

Here, of course, the Report was written by a consultant, not an agency insider.

Nonetheless, the Second Circuit has recognized that "agencies may require assistance from

outside consultants in formulating policy and has held that nothing turns on the point that reports

were prepared by outside consultants rather than agency staff."  Tigue, 312 F.3d at 77 (citation

omitted and internal punctuation altered).  What matters instead is "the intrinsic character of the

document itself" and "the role it played in the administrative process."  Id. at 78 (quotation

marks and citation omitted).

For a particular inter-agency or intra-agency document to be protected by the privilege,

the agency must demonstrate that the document is both "(1) predecisional, i.e., prepared in order

to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, i.e.,

actually . . . related to the process by which policies are formulated."  Am. Civ. Liberties Union

v. Nat'l Sec. Agency, 925 F.3d 576, 592 (2d Cir. 2019) (citations omitted).

This predecisional element distinguishes documents prepared before a final agency

decision, which are protected, from "postdecisional memoranda setting forth the reasons for an

agency decision already made, which are not." <u>Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.</u>, 421 U.S. 168, 184 (1975).  Thus, this element looks to whether the document was "received by the decisionmaker on the subject of the decision prior to the time the decision is made to ensure that the subsequent decision will be fully informed." <u>Am. Civ. Liberties Union</u>, 925 F.3d at 592 (quotation marks and citation omitted).

As for the "deliberative" requirement, "the privilege does not protect "a document which is merely peripheral to actual policy formation." <u>Grand Cent. P'ship</u>, 166 F.3d at 482 (quotation marks and citation omitted).  Rather, "the record must bear on the formulation or exercise of policy-oriented judgment." <u>Id.</u> (quotation marks and citation omitted).  In addressing this aspect, some courts have considered "if the document 'formed an essential link in a specified consultative process' . . . and if released, would 'inaccurately reflect or prematurely disclose the views of the agency.'" <u>Seife v. U.S. Dep't of State</u>, 298 F. Supp. 3d 592, 614 (S.D.N.Y. 2018) (quoting <u>Grand Cent. P'ship</u>, 166 F.3d at 482).  The Second Circuit, while quoting this test favorably, has also suggested that it may be sufficient for the link to be merely "important" rather than "essential." <u>Grand Cent. P'ship</u>, 166 F.3d at 483.[3]

2.  <u>Application of Law Governing the Deliberative Process Privilege</u>

Plaintiffs make a number of challenges to HHS's assertion of the deliberative process privilege.

First, plaintiffs argue that documents prepared by consultants are considered inter- or

_____

[3]  In accordance with these principles, the deliberative process privilege does not extend to "purely factual, investigative matters." <u>EPA v. Mink</u>, 410 U.S. 73, 89 (1973); <u>accord</u> <u>Hopkins v. United States Dep't of Housing & Urban Dev.</u>, 929 F.2d 81, 85 (2d Cir. 1991); <u>Local 3, Int'l Bhd. of Elec. Workers v. NLRB</u>, 845 F.2d 1177, 1180 (2d Cir.1988).  If factual portions of a document are "severable without compromising the private remainder of the document[]," then the factual portions must be disclosed, even though the deliberative material remains protected. <u>Mink</u>, 410 U.S. at 91.

intra-agency materials "only . . . in the context of a rule-making process."  Pl. Mem. at 35.

Plaintiffs cite to both Lead Indus. Ass'n v. OSHA, 610 F.2d 70 (2d Cir. 1979), and Tigue for this

contention.  While Lead Indus. concerned a rulemaking process, it contains no holding that

materials emanating from consultants may be protected by the deliberative process privilege

"only" in the context of a rule-making process.  The Second Circuit's later decision in Tigue not

only contains no such holding but actually upheld a claim of deliberative process of a

memorandum prepared by an outside body that "was acting as a consultant to the . . . agency, to

assist that agency with developing policy recommendations . . . ."  Tigue, 312 F.3d at 78.  No

rule-making process was involved.  Thus, we reject plaintiff's argument that a consultant's report

is protected only in the context of rulemaking.

Plaintiffs cite to Klamath to contend that Integritas "did not 'function[] as an arm' of

[IHS], as a 'pure objective proxy for [IHS],' or 'like [IHS]'s own personnel,'" and thus the

Report cannot be considered an inter- or intra-agency communication.  Pl. Mem. at 36 (citing

Klamath, 532 U.S. at 12).  Plaintiffs argue that Integritas did not function as such because it was

"hired precisely to provide an *independent* assessment of where the agency went wrong."  Id.

But the fact that Integritas operated "independently" — as is common for consultants — does not

detract from the fact that the purpose of the Report was for IHS to use it to make its decisions

regarding any policy changes.  It is for this reason that the statute protects not only "intra-" but

also "inter-" agency communications.  As the Supreme Court has noted in a related context,

"Congress plainly intended to permit one agency possessing decisional authority to obtain

written recommendations and advice from a separate agency not possessing such decisional

authority . . . ."  Grumman Aircraft Eng'g Corp., 421 U.S. at 188.

Klamath is not to the contrary, as it merely noted that the doctrine including consultant

reports in the deliberative process privilege — sometimes known as the "consultant corollary"

doctrine — could not extend to "communications to or from an interested party seeking a

Government benefit at the expense of other applicants," Klamath, 532 U.S. at 12 n.4.  But the

plaintiffs here make no such argument about Integritas and, in the absence of such an argument,

"nothing turns on the point that reports were prepared by outside consultants rather than agency

staff."  Tigue, 312 F.3d at 77 (quotation marks and citation omitted and internal punctuation

altered).  What matters rather is "the intrinsic character of the document itself," and "the role it

played in the administrative process."  Id. (quotation marks and citation omitted).  In other

words, what matters is the predecisional and deliberative nature of the document.

Plaintiffs argue that the Report cannot be predecisional because IHS had already changed

its policy "*before* the Integritas Report was even solicited."  Pl. Mem. at 32.  They claim that

since there "is no indication, that further policy decisions were made or contemplated based upon

the Integritas Report," the Report cannot be a predecisional document.  Id.

Plaintiff's argument on this point fails because the agency's obligation is only to show

that the material was intended to assist in future policy decisions.  There is no requirement the

agency prove that such a decision was actually made.  See, e.g., Tigue, 312 F.3d at 80 ("the fact

that the government does not point to a specific decision made by the [agency] in reliance on the

[withheld material] does not alter the fact that the [withheld material] was prepared to assist IRS

decisionmaking on a specific issue"); Sears, 421 U.S. at 153 n.18 ("Our emphasis on the need to

protect pre-decisional documents does not mean that the existence of the privilege turns on the

ability of an agency to identify a specific decision in connection with which a memorandum is

prepared.").  The factual material in the record shows that the Report was prepared specifically

to make recommendations about policy changes, even if some policy changes had already been

made.  Merrell has provided a sworn statement that the Report was commissioned "for the purpose of assessing the effectiveness of IHS's policies and procedures governing the reporting of allegations of sexual abuse by an IHS health care provider," and the Report was meant "to determine what steps IHS could take to correct the patient safety and medical care issues arising from Stanley Patrick Weber's sexual abuse of minors . . . ."  Merrell Decl. ¶ 7.  Plaintiffs themselves have put into the record a report by the HHS Office of the Inspector General which, while noting that IHS had already issued "new policies in the IHM" related to "preventing child sexual abuse," also noted that IHS had commissioned "an independent medical quality assurance review" that would both "identify system failures" and "determine any further improvements that IHS can implement to better protect patients."  OIG Report at 5 (cited by Pl. Mem. at 16) (emphasis added).  The original solicitation itself made plain that the purpose of the Report was to assist in making a future policy decision.  See Solicitation at 2 (Report was designed to "to develop and/or improve policies and procedures that focus on . . . Timely reporting of suspected or known sexual abuse of IHS patients by IHS providers to appropriate authorities"); see also Sources Sought Notice at 2 (Report intended "to identify any improvements IHS could implement to better protect both patients and staff."); Where Are They Now: Indian Programs on the GAO High Risk List, Hearing Before the S. Comm. on Indian Affairs, 116th Cong. 51 (2019) (statement of Rear Admiral Michael Weahkee), annexed as Exhibit 11 to Kelley Decl. (Report intended to "fill in those gaps" of policies that allowed sexual abuse to occur) ("Hearing Testimony").  The content of the Report itself — which contains numerous recommendations for improvements — supports this conclusion.  Thus, the Report is a predecisional document.

Plaintiffs argue that the Report is not "deliberative."  Pl. Mem. at 32.  As noted, the "deliberative" factor asks whether the document is "part of a process by which governmental

17

decisions and policies are formulated." Grand Cent. P'ship, 166 F.3d at 482 (quotation marks

and citation omitted). It is unclear what plaintiff's argument is on this point. They assert that

HHS "has not established that the report implicates the policymaking process in any way." Pl.

Mem. at 33. But, as just noted, the Report was specifically commissioned to assist IHS in

making changes to its policies to prevent sexual misconduct. Plaintiffs assert that the Report

cannot be deliberative because it is as a solely "retrospective, factual review of the agency's

compliance with a prior policy," Pl. Reply at 2. This assertion is irrelevant, however, as purely

factual material may be highly germane to a policy decision. Moreover, the Merrell Declaration

makes clear that such a retrospective analysis was only part of the Report's purpose, and that,

using the retrospective analysis, the Report was to identify system failures and recommend

improvements. See Merrell Decl. ¶ 9. Again, evidence submitted by plaintiffs themselves also

makes this clear. For instance, the hearing testimony of Admiral Weahkee lays out how the

retrospective analysis ties into the policy formulation:

> What we hope to do, objectively, again, with the third-party eye, is to have somebody
> look back and determine where the missed opportunities took place. We want to make
> sure that we gauge things against the policies that were in place at the time. Were those
> policies followed? If not, where the breakdowns occurred and who should be held
> accountable for those policies not being put into place.
>
> Ultimately, the goal is to fill in those gaps, make sure that we have policies, that people
> know what the policies are, that we are training on them, and that we are creating the
> culture of accountability and the just culture I mentioned of people not fearing retaliation
> for reporting up.

Hearing Testimony at 51.

Plainly, the Report was "related to the process by which policies are formulated," and

thus is "deliberative." Grand Cent. P'ship, 166 F.3d at 482 (quotation marks and citation

omitted). The Court's own review of the Report confirms this characterization.

3. Application of FOIA Improvement Act of 2016

The fact that the material might have been withheld in litigation as protected by the deliberative process privilege, however, does not end the FOIA inquiry.  As we have already noted, under the FOIA Improvement Act of 2016, 5 U.S.C. § 552(a)(8)(A)(i), demonstrating that a document falls within an applicable exemption is no longer sufficient to justify its withholding. Rather, "an agency must release a record — even if it falls within a FOIA exemption — if releasing the record would not reasonably harm an exemption-protected interest and if its disclosure is not prohibited by law."  Nat'l Day Laborer Org. Network v. United States Immigration & Customs Enf't, 2020 WL 5518114, at *7 (S.D.N.Y. Sept. 14, 2020) (quoting Rosenberg v. U.S. Dep't of Def., 342 F. Supp. 3d 62, 73 (D.D.C. 2018)).  Given that no statute prevents the Report's disclosure, the remaining issue is whether "the agency reasonably foresees that disclosure would harm an interest protected by" the deliberative process privilege.  5 U.S.C. § 552(a)(8)(A)(i).  The Supreme Court has held that the "object [of the deliberative process privilege] is to enhance the quality of agency decisions . . . by protecting open and frank discussion among those who make them within the Government. . . ."  Klamath, 532 U.S. at 8-9 (quotation marks and citations omitted).

As Judge Engelmayer recently noted in the context of the use of the deliberative process privilege to withhold material under Exemption 5:

> [T]to satisfy the foreseeable harm standard,' an agency 'must explain how a particular Exemption 5 withholding would harm the agency's deliberative process.'  An agency may not 'perfunctorily state that disclosure of all the withheld information — regardless of category or substance — would jeopardize the free exchange of information' among or between government officials."  Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency ("NRDC I"), No. 17 Civ. 5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019) (internal citations omitted) (quoting Rosenberg, 342 F. Supp. 3d at 78) (citing Judicial Watch, Inc. v. U.S. Dep't of Com., 375 F. Supp. 3d 93, 99-100 (D.D.C. 2019)); see also

Judicial Watch, 375 F. Supp. 3d at 100 ("boiler plate" and generalized articulations of harm insufficient).  "If the mere possibility that disclosure discourages a frank and open dialogue was enough for the exemption to apply, then Exemption 5 would apply whenever the deliberative process privilege was invoked regardless of whether disclosure of the information would harm an interest protected by the exemption."  Judicial Watch, 375 F. Supp. 3d at 101; see also NRDC I, 2019 WL 3338266, at *1 (directing agency to "submit a supplemental or revised affidavit and/or Vaughn index that more specifically and particularly describes the Exemption 5-related interests that would be harmed by disclosure of the documents at issue").

Nat'l Day Laborer Organizing Network, 2020 WL 5518114, at *7.  A District of Columbia

decision characterizes the burden under the FOIA Improvement Act of 2016, 5 U.S.C.

§ 552(a)(8)(A), as follows:

The question is not whether disclosure could chill speech, but rather if it is reasonably foreseeable that it will chill speech and, if so, what is the link between this harm and the specific information contained in the material withheld.  It is not enough for an agency to speculate that harm could result from disclosure.  It must connect the harms in a meaningful way to the information withheld, such as by providing context or insight into the specific decision-making processes or deliberations at issue, and how they in particular would be harmed by disclosure.  In doing so, an agency must avoid the use of nearly identical boilerplate statements and generic and nebulous articulations of harm.

Judicial Watch, Inc. v. U.S. Dep't of Justice, 2020 WL 5798442, at *3 (D.D.C. Sept. 29, 2020)

(internal punctuation marks and citations omitted); see also Judicial Watch, Inc. v. U.S. Dep't of

Commerce, 2020 WL 6939807, at *6 (D.D.C. Nov. 25, 2020) (quoting an acceptable agency

explanation).   In keeping with these principles, the court in Nat. Res. Def. Council v. U.S. Envtl.

Prot. Agency, 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019), rejected as insufficient the

conclusory assertion by the agency that "'[r]elease of the withheld information would discourage

open and frank discussion' and 'have a chilling effect on the Agency's decision-making

processes.'"  Id.

In this case, HHS has not even made the conclusory assertion about agency decision

making that was found insufficient in <u>Nat. Res. Def. Council.</u>, 2019 WL 3338266, at *1.  Rather, the only assertion pointed to by HHS as describing the harm to an exemption-protected interest, <u>see</u> Def. Reply at 13, is the statement by Merrell that disclosing the Report "would have a chilling effect on future participation" because "[p]articipants had an expectation that the information they provided would be kept confidential."  Merrell Decl. ¶ 12.  HHS has supplied nothing else on any harm that could be foreseen from disclosing the Report.

The statements by Merrell are insufficient for HHS to meet its burden for two independent reasons.  First, the assertion that "participants" — presumably meaning the victims, family members, myriad health professionals and low-level office administrators who worked with Weber and were interviewed by Integritas — had an expectation that their information would be kept confidential is unsupported by any competent evidence.  Most significantly, Merrell never explains how he knows that the "participants" (whom he does not even define) had such an "expectation" and does not assert that he has any personal knowledge of this fact.  Moreover, the notion that participants had such an expectation is belied by the only declaration in the record from such a participant: a doctor for the IHS interviewed by Integritas.  The doctor states that the Integritas investigators "did not state that the interview was confidential or that my identity would remain confidential," and that when he "asked if I could talk about the interview with others," the investigator "did not tell me to keep any information about the interview confidential, nor did he indicate in that follow-up conversation that my interview or identity would be kept confidential."  Butterbrodt Decl. ¶ 13.  HHS was provided this affidavit with the plaintiffs' opposition brief but did not even advert to it in its reply brief, let alone supply rebuttal evidence on the issue of what promises of confidentiality were given to participants.  Finally, the Report itself in its section on "Methods of Investigation and Analysis" contains no suggestion

that investigators ever promised confidentiality to any witnesses.  The closest the Report comes

is a statement that it was identifying witnesses by the name in the Report unless the witness

specifically requested anonymity.  Report at 3.  If anything, this suggests that any witness

actually identified had no expectation of confidentiality.

But we reject HHS's evidence for an additional and more fundamental reason: namely,

even if we accepted Merrell's assertion as true, the justification Merell gives has nothing to do

with "an interest protected by" the deliberative process privilege.  5 U.S.C. § 552(a)(8)(A)(i).  As

we have already noted, the purpose of the deliberative process privilege is to "enhance the

quality of agency decisions . . . by protecting open and frank discussion among those who make

them within the Government. . . ."  Klamath, 532 U.S. at 8-9 (quotation marks and citations

omitted).  In other words, the "interest protected by" the deliberative process privilege is the free

flow of communications among decisionmakers.  Merrell's declaration makes no suggestion that

communication among decisionmakers would be harmed by the release of the Report.  Rather,

Merrell makes claims about the purported willingness of participants in interviews to be candid

with investigators.  Thus, HHS never claims (and the Court's in camera review of the Report

does not reveal) that witnesses interviewed by Integritas were "decisionmakers" as to future

remedial steps to be taken by IHS.  Nor could such an assertion be made inasmuch as the

deliberative process privilege protects deliberations among policymakers.  See, e.g., Nat'l Day

Laborer Organizing Network, 2020 WL 5518114, at *5 ("the privilege seeks to encourage

candor between policymakers and thereby improve the quality of the policymaking itself")

(citation omitted).  The agency has provided literally no evidence whatsoever as to how the work

of policymakers at HHS would be chilled by disclosure of the Report.

This is perhaps not surprising.  It is one thing to disclose discussions by agency staff

formulating policy as this would naturally inhibit future discussions if staff thought their advice might be revealed to the public.  See, e.g., Machado Amadis v. United States Dep't of State, 971 F.3d 364 (D.C. Cir. 2020) (agency met its burden under FOIA Improvement Act by explaining that revelation of withheld materials "would discourage line attorneys from candidly discussing their ideas, strategies, and recommendations, thus impairing the forthright internal discussions necessary" to reach the agency decision at issue) (quotation marks omitted).  It is quite another to assert that "participants" in a factual investigation would be affected when they have not been shown to have any role in making policy or advising policymakers.

In sum, HHS has not met its burden under the FOIA Improvement Act of 2016 to show that it "reasonably foresees that disclosure would harm an interest protected by" the deliberative process privilege.  5 U.S.C. § 552(a)(8)(A)(i).  Accordingly, the Report must be produced.

C.  Exemption 6

HHS asserts that portions of the Report may be withheld pursuant to 5 U.S.C. § 552(b)(6) ("Exemption 6").  Exemption 6 provides that the government may withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Determining whether Exemption 6 permits an agency to withhold information involves a three-step analysis.  See Associated Press v. U.S. Dep't of Def., 554 F.3d 274, 291-93 (2d Cir. 2009).  First, a court must determine whether the records sought amount to "personnel and medical files and similar files."  See id. at 291. Second, a court must determine whether the privacy interest implicated by disclosure is "measurable" or "more than de minimis."  Id. at 285, 291-92 (citations omitted).  Third, if disclosure would implicate a measurable privacy interest, the Court must determine whether the invasion of personal privacy outweighs the public's interest in disclosure.  See id. at 293; Wood

23

v. FBI, 432 F.3d 78, 87 (2d Cir. 2005).

HHS does nothing to demonstrate any of this, however.  Its arguments on this exemption are limited to a single footnote in its opening memorandum, see Def. Mem. at 12 n.4, and a single paragraph in its reply, see Def. Reply at 14.  The language used is nearly identical, and the argument amounts to a single sentence: "The Integritas Report contains information about patients, staff and other individuals, the disclosure of which would plainly be an unwarranted invasion of personal privacy."  Id.; see also Def. Mem. at 12 n.4 (same).  This conclusory assertion — unsupported by anything in the Merrell Declaration — does not satisfy HHS's burden of demonstrating "that any withheld documents fall within an exemption to the FOIA." Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994).

That being said, the Court is loath to hold that HHS has waived the possibility of redacting any material at all based on Exemption 6 in light of the fact that the personal privacy interests of people who are not a party to this litigation are at stake.  The Exemption was meant to protect their privacy and HHS's choices in briefing this motion should not compromise those interests.  On the other hand, there should be no unnecessary delay in the release of Report.

Accordingly, the Court will proceed as follows.  HHS shall produce the Report to plaintiffs within 14 days of this decision, except that it may redact information that it contends in good faith is protected by Exemption 6.  If the plaintiffs disagree with any of the redactions, they shall discuss the issue with HHS to see if agreement can be reached.  If not, they shall so inform the Court by letter and propose a briefing schedule to address the application of Exemption 6.

IV.  CONCLUSION

For the foregoing reasons, HHS's motion for summary judgment (Docket # 19) is denied and plaintiffs' cross-motion (Docket # 22) is granted.  HHS shall produce the Report within 14

24

days, with only redactions pursuant to Exemption 6 permitted.

       SO ORDERED.

Dated:  January 13, 2021
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge